**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **EUGENIE BOUCHARD** ) | |
| ) | |
| ) | Civ. Act. No.:1:15-cv-5920-AMD-MDG |
| **Plaintiff**, ) | |
| **v.** ) | Judge Ann M. Donnelly |
| ) | |
| ) | Magistrate Judge Lois Bloom |
| **UNITED STATES TENNIS ASSOCIATION,** ) | |
| **INC., and USTA NATIONAL TENNIS** ) | |
| **CENTER, INC.** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**

**MOTION FOR SANCTIONS DUE TO DEFENDANTS' SPOLIATION OF EVIDENCE**

Benedict P. Morelli
David T. Sirotkin
Perry S. Fallick
**MORELLI LAW FIRM PLLC**
777 Third Avenue, 31st Floor
New York, NY 10017
T: (212) 751-9800
F: (212) 751-0046

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT …………………………………………………………1

STATEMENT OF FACTS ……………………………………………………………...4

ARGUMENT……………………………………………………………………………23

I.   The Sanction of an Adverse Inference Jury Instruction is
     Warranted because Defendants Intentionally Deprived Plaintiff of
     Highly Relevant Security Camera Footage that Cannot be Restored or
     Replaced through Additional Discovery………………………………………...…23

     A.   Legal Standard ……………...…………………..………………………23

     B.   Plaintiff is Entitled to an Adverse Inference
          Instruction Pursuant to Fed. R. Civ. P. 37(b) …………………….……...…26

     C.   Plaintiff is Entitled to an Adverse Inference Instruction
          Pursuant to Fed. R. Civ. P. 37(e) because Defendants
          Pattern and Practice of Egregious Discovery Abuses
          Throughout this Case Illustrates and Supports
          Plaintiff's Claims that Defendants' Destruction of the
          Security Camera Footage was Intentional……………………………………28

     D.   Plaintiff is also Entitled to an Adverse Inference Instruction
          Pursuant to this Court's Inherent Authority to Control the Litigation …………..31

     E.   Plaintiff has been Prejudiced by
          Defendants' Destruction of Evidence ……………………………......………..32

     F.   The Sanction of an Adverse Jury Instruction is Warranted for
          Defendants' Failure to Preserve the Security Camera Footage ………….............33

CONCLUSION……………………….…...…………………………………………….35

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beers v. Gen. Motors Corp.*,
  No. 97-CV-482(NPM/DNH), 1999 WL 325378 (N.D.N.Y. May 17, 1999) .......................... 32

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001) ......................................................................................... 24

*CAT3, LLC v. Black Lineage, Inc.*,
  164 F. Supp. 3d 488 (S.D.N.Y. 2016) ................................................................ 28, 30, 31

*Ceglia v. Zuckerberg*,
  600 F. App'x 34 (2d Cir. 2015) ................................................................................... 31

*Chan v. Triple 8 Palace, Inc.*,
  No. 03CIV6048 (GEL)(JCF), 2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ......................... 25

*Chin v. Port Auth. of N.Y. & New Jersey*,
  685 F.3d 135 (2d Cir. 2012) .................................................................................. 25, 27

*Condit v. Dunne*,
  225 F.R.D. 100 (S.D.N.Y. 2004) ................................................................................. 27

*Dataflow, Inc. v. Perrless Ins. Co.*,
  2013 WL 6992130 (N.D.N.Y. June 6, 2013) ................................................................. 27

*Field Day, LLC v. Cty. of Suffolk*, No. CIV. A.,
  04-2202, 2010 WL 5490990 (E.D.N.Y. Dec. 30, 2010) .................................................. 34

*Field Day, LLC v. Cty. of Suffolk*, No. CIV.A,
  04-2202, 2010 WL 1286622 (E.D.N.Y. Mar. 25, 2010) .......................................... 23, 32, 34

*Fujitsu Ltd. v. Fed'l Express Corp.*,
  247 F.3d 423 (2d Cir. 2001) ...................................................................................... 23

*Golia v. Leslie Fay Co.*,
  No. 01 CIV. 1111 (GEL), 2003 WL 21878788 (S.D.N.Y. Aug. 7, 2003) ............................. 33

*Hsueh v. N.Y. State Dep't of Fin. Servs.*,
  No. 15 CIV. 3401 (PAC), 2017 WL 1194706 (S.D.N.Y. Mar. 31, 2017) ......................... 29, 31

*In re Pfizer Inc. Sec. Litig.*,
  288 F.R.D. 297 (S.D.N.Y. 2013) ................................................................................. 26

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998)............................................................................... 24

*Matteo v. Kohl's Dep't Stores, Inc.*,
  533 F. App'x 1 (2d Cir. 2013) .......................................................................... 34

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,
  271 F.R.D. 429 (S.D.N.Y. 2010) ................................................................ 25, 27

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am.,
  Sec.*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010) ......................................... 24, 25, 27, 32

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
  306 F.3d 99 (2d Cir. 2002)........................................................................... 23, 26

*Schwarz v. FedEx Kinko's Office and Print Servs., Inc.*,
  No. 08-CV-6486, 2009 WL 3459217 (S.D.N.Y. Oct. 27, 2009)............................ 24

*Sekisui Am. Corp. v. Hart*,
  945 F. Supp. 2d 494 (S.D.N.Y. 2013)........................................................... 26, 27

*Siani v. State Univ. of N.Y. at Farmingdale*,
  No. CV09-407 JFB WDW, 2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010) ........... 24

*SJS Distribution Sys., Inc. v. Sam's E., Inc.*,
  No. 11 CV 1229 WFK RML, 2013 WL 5596010 (E.D.N.Y. Oct. 11, 2013)............. 32, 34

*Skyline Steel, LLC v. PilePro, LLC*,
  No. 13-CV-8171 JMF, 2015 WL 3739276 (S.D.N.Y. June 15, 2015) ...................... 34

*West v. Goodyear Tire & Rubber Co.*,
  167 F.3d 776 (2d Cir. 1999)......................................................................... 23, 32

*Williams v. N.Y. City Transit Auth.*,
  No. 10 CV 0882 ENV, 2011 WL 5024280 (E.D.N.Y. Oct. 19, 2011) ..................... 26

*Zubulake v. UBS Warburg LLC*,
  220 F.R.D. 212 (S.D.N.Y. 2003) ................................................................ 24, 25

*Zubulake v. UBS Warburg LLC*,
  229 F.R.D. 422 (S.D.N.Y. 2004) ……………………………………………………..25

**Rules**

Fed. R. Civ. P. 26 ....................................................................................................... 21

Fed. R. Civ. P. 37 .................................................................................................... 23, 34, 35

Fed. R. Civ. P. 37(b) ..................................................................................................... 26

Fed. R. Civ. P. 37(e) ................................................................................... 28, 29, 31, 33

## PRELIMINARY STATEMENT

Plaintiff Eugenie Bouchard respectfully submits this Memorandum of Law in Support of her Motion, pursuant to Fed. R. Civ. P. 37(b), 37(e), and this Court's inherent authority, for an Order granting sanctions against the United States Tennis Association, Inc., and USTA National Tennis Center, Inc.'s (collectively hereinafter "Defendants" or "USTA") for the spoliation of evidence, specifically: (1) an adverse inference jury instruction against Defendants for intentionally depriving Plaintiff of evidence that would have been favorable to Plaintiff and adverse to the interests of the USTA; (2) punitive monetary sanctions; (3) an assessment against Defendants for the costs and fees incurred by Plaintiff on this Motion; and (4) such other relief as this Court deems just and proper.

Ms. Bouchard is a professional women's tennis player whose lawsuit arises out of off-court injuries she sustained at the 2015 U.S. Open when she was caused to slip and fall on a cleaning substance that was applied to the floor of the trainer's room located within the women's locker room.   As a result, Ms. Bouchard sustained a serious head injury, was forced to withdraw from all competitions at the 2015 U.S. Open and missed several subsequent tournaments.   Ms. Bouchard also sustained severe emotional and economic injuries as a result of this accident.

The basis of Plaintiff's Motion for Sanctions is that the USTA intentionally destroyed security camera footage in an effort to deprive Plaintiff of evidence relevant to her claims in this case, despite having been notified to preserve any such evidence, and despite having had a legal obligation to cease routine data destruction policies and institute a litigation hold.   This egregious infraction is the culmination of a pattern and practice by Defendants throughout the discovery process during which they have consistently played fast and loose with retaining and

1

divulging critical information—despite being obligated to do so—all to Plaintiff's detriment.

Specifically, the Defendants have: (1) intentionally deprived Plaintiff of highly relevant security camera footage from the night of Plaintiff's accident; (2) failed to disclose the USTA locker room attendant who actually applied the cleaning substance to the floor on the night of Plaintiff's accident; and (3) concealed the applicable insurance coverage despite being required to disclose it in their automatic initial disclosures.   The USTA must be sanctioned in the strongest possible manner because of their pattern of egregious conduct and the continued and irreparable harm that Plaintiff has suffered as a result.

It is well-established that parties to a litigation have a legal obligation to preserve relevant evidence as soon as litigation is reasonably anticipated.   Here, Defendants' duty to preserve all relevant evidence arose no later than September 16, 2015, when, in anticipation of litigation, Plaintiff sent Defendants a preservation letter demanding that Defendants: (1) preserve all evidence relevant to Plaintiff's accident; (2) preserve any security camera footage of the locker room and surrounding areas; and (3) cease all routine data destruction policies in place.   In fact, Defendants' duty to preserve arose even earlier, on September 5, 2015, the day following Plaintiff's accident, when the USTA's Senior Legal Counsel began conducting an accident investigation, including multiple in-person interviews, all in anticipation of litigation.

Less than twenty-four hours after Ms. Bouchard's accident, the USTA was already in a defensive posture anticipating litigation.   Yet, instead of working to protect one of its most important players and figuring out what actually caused Ms. Bouchard's accident, the USTA was more concerned with interviewing Ms. Bouchard's car service driver from the night of her accident in an effort gain any information they possibly could to disparage Ms. Bouchard and

2

protect themselves.   What relevant information could Ms. Bouchard's driver possibly add

regarding the happening of the accident?   None.   If Defendants wanted to learn what actually

caused Ms. Bouchard's accident, they would have interviewed all of the USTA locker room

attendants who worked on the night of the accident, which was only three people.   The USTA

chose not to, and, in fact, failed to even determine which of their employees actually applied the

cleaning substance.   Instead, Defendants chose to interview Ms. Bouchard's driver during this

critical time period.   This is clear evidence that the USTA's only motive was to defend and

insulate themselves from liability because they know they are responsible for Ms. Bouchard's

accident.   Defendants' so-called "investigation" was nothing more than a sham cover-up.   The

totality of Defendants' actions in this case evidence their intent to destroy the relevant security

camera footage and deprive Plaintiff of crucial evidence needed to prove her case.

      As will be set forth below, Defendants' so-called "investigation" was done in an effort to

protect the USTA and disparage the Plaintiff, not to protect the evidence pertinent to Plaintiff's

case.   Notwithstanding being on notice of a forthcoming lawsuit and clearly aware of their legal

obligations, the Defendants flouted their responsibilities, failed to institute any litigation hold,

and admittedly destroyed relevant security camera footage from the night of Plaintiff's accident.

Ms. Bouchard has been irreparably prejudiced by the destruction of this highly relevant evidence

and respectfully requests that an adverse inference jury instruction be granted against

Defendants.   An adverse inference instruction that the "Defendants intentionally deleted security

camera footage that would have been harmful to the Defendants and favorable to the Plaintiff" is

the only appropriate remedy in this case.   Indeed, an adverse inference is the only remedy

available to Plaintiff that would provide any modicum of relief for Defendants' intentional

destruction of evidence that cannot be restored or replaced through additional discovery. Punitive monetary sanctions, including Plaintiff's costs and attorneys' fees, are also an appropriate remedy based on Defendants' intentional conduct, but are not alone sufficient to cure the harm that has been done.

## STATEMENT OF FACTS

### Plaintiff's Accident – September 4, 2015

On the evening of September 4, 2015 at the U.S. Open Tennis Championships, Plaintiff Eugenie Bouchard suffered serious off-the-court injuries when she was caused to slip and fall on a dangerous and slippery cleaning substance which had been applied by Defendants' employees to the tile floor of the trainer's room within the women's locker room.   Ms. Bouchard had won a mixed-doubles match that evening which concluded at approximately 9:45 p.m.   (*See* Declaration of Benedict P. Morelli In Support of Plaintiff's Motion for Sanctions dated May 16, 2017 (hereinafter the "Morelli Decl."), **Exhibit A**, 59:25-60:22.)   Ms. Bouchard stayed on the court for approximately twenty minutes after the match concluded so she could sign autographs for fans and do on-court interviews.   (Ex. A, 62:20-63:3.)   Ms. Bouchard first entered the women's locker room at approximately 10:05 p.m. and went to her locker.   (Ex. A, 63:4-7.)

After taking a shower, Ms. Bouchard had a conversation within the women's locker room with Women's Tennis Association ("WTA") trainer Kristy Stahr.   (Ex. A, 66:17-67:17.)   Kristy Stahr was on duty the evening of Ms. Bouchard's accident.   (*See* Morelli Decl., **Exhibit B**, 57:6-8.)   During Grand Slam tournaments such as the U.S. Open, the WTA trainers work under the umbrella of the USTA.   (Ex. B, 17:14-21.)   During that conversation, Kristy Stahr asked Ms. Bouchard if she needed anything from her or any of the other WTA trainers.   (Ex. A, 68:4-8.).

4

Ms. Bouchard responded that she was first going to do her post-match cool down exercises, hold her required post-match press conference, and specifically stated that she would then return to the women's locker room to use one of the ice baths located within the trainer's room.   (Ex. A, 68:9-69:2, 73:16-22; Ex. B, 102:22-103:2.)   Ms. Bouchard then exited the locker room and headed to the fitness center to do her routine post-match cool down exercises.   (Ex. A, 72:17-25.)   During her deposition, Kristy Stahr admitted that she remained in the women's locker room after Ms. Bouchard departed "[t]o wait for her to come back to take an ice bath."   (Ex. B, 68:6-10.)   The fitness center is located down the hall from the women's locker room and three floors up.   (Ex. A, 73:12-15; *see also* Morelli Decl., **Exhibit L**.)

After finishing her cool down, Ms. Bouchard headed to the press/interview room to fulfill her media obligations.   (Ex. A, 76:6-16.)   The three interview rooms at the National Tennis Center are located down the hall from the women's locker room in the opposite direction from the fitness center.   (Ex. A, 76:17-23; *see also* Ex. L.)   At the conclusion of her press conference, Ms. Bouchard went back to the women's locker room in order to take an ice bath. (Ex. A, 77:24-4.)   She returned to the women's locker room at approximately 11:10 p.m.   (Ex. A, 78:14-79:4.)   When she entered the locker room, inexplicably, despite Ms. Bouchard clearly informing Kristy Stahr that she would be returning to take an ice bath, all of the trainers had left for the evening.   (Ex. A, 80:24-81:2.)   It has been identified from the only security camera footage actually produced by Defendants that the trainers had left at 11:05 p.m., or just five minutes before Ms. Bouchard returned to the locker room.   (*See* Morelli Decl., **Exhibit M**.) The only people remaining in the women's locker room besides Ms. Bouchard were the USTA employed locker room attendants.   (Ex. A, 80:8-23.)

5

During her deposition, Kristy Stahr admitted that she personally made no effort to look for Ms. Bouchard before leaving for the night.   (Ex. B, 81:18-24.)   WTA senior trainer Eva Scheumann allegedly went to the area where the three interview rooms were located to look for Ms. Bouchard, but allegedly could not find her.   (Ex. B, 81:25-82:12.)   Kristy Stahr testified that as the senior therapist on duty that evening, it was solely Eva Scheumann's decision for the trainer's to leave prior to Ms. Bouchard returning to take an ice bath.   (Ex. B, 117:11-15.) Kristy Stahr further testified that as the senior therapist, she relied on Eva Scheumann and trusted that Ms. Scheumann actually went and looked for Ms. Bouchard, but was unable to find her. (Ex. B, 162:12-163:4.)   According to Kristy Stahr, Eva Scheumann knew that Ms. Bouchard intended to return to take an ice bath, but told the WTA trainers "we've waited long enough." (Ex. B, 117:19-25.)

At the time the trainers left for the evening, the tile floor in the trainer's room had not yet been cleaned.   (Ex. B, 140:11-25.)   Kristy Stahr testified that although the door to the trainer's room might have been closed when the trainers left for the evening, she knew that the USTA locker room attendants would still need to open the door to the trainer's room in order to clean the floor.   (Ex. B, 164:17-23.)   It is undisputed that the USTA locker room attendants were required to wait until *all* WTA trainers and *all* players were gone for the evening before they could clean the floor of the trainer's room.   (*See* Morelli Decl., Ex. B, 164:3-14; Ex. C, 21:13-22:2, 32:25-33:15; Ex. J, 44:11-45:46:24; Ex. K, 25:2-22.)

Karen Owens was employed by the USTA as the supervisor for the women's locker room attendants during the 2015 U.S. Open.   (Morelli Decl., **Exhibit C**, 12:4-14, 13:14-19.)   Ms. Owens has worked for the USTA since approximately 1988, and has been a locker room

supervisor since approximately 1998.   (Ex. C, 6:14–8:2).   The locker room attendants were responsible for cleaning floors, including the trainer's room floor, at the direction of Karen Owens.   (Ex. C, 15:13-15.)   Ms. Owens admitted that she was responsible for making sure all cleaning in the women's locker room was done safely for the benefit of the players.   (Ex. C, 19:4-24.)   Ms. Owens testified that the floor to the trainer's room was cleaned at the end of each day, but only after all the WTA trainers had left.   (Ex. C, 21:13-22:2.)   Ms. Owens also admitted that the floor to the trainer's room could only be cleaned after all the players had left for the evening.   (Ex. C, 32:25-33:15.)   Ms. Owen's admitted that as supervisor it was her decision to determine when the floor of the trainer's room could be cleaned.   (Ex. C, 22:3-16.)   Ms. Owens testified that one of the ways she made the determination that it was safe to clean the trainer's room floor, including on the night of Ms. Bouchard's accident, was when the WTA trainers left for the evening.   (Ex. C, 37:9-22, 43:23-25.)

Karen Owens testified that the night in question was the very first time that the locker room attendants had *ever* used this specific cleaning substance on the floor of the trainer's room, which was a more heavy-duty cleaning substance.   (Ex C, 26:11-25, 27:10-21, 30:13–31:4). Ms. Owens also admitted that after the slippery cleaning substance had been sprayed on the floor of the trainer's room, she saw Ms. Bouchard enter the women's locker room, but did not warn her in any way that the substance had just recently been applied.   (Ex. C, 70:2-8.)   Therefore, USTA employee Karen Owens was on notice that not all players had left the premises and still she failed to warn Ms. Bouchard about the slippery and dangerous condition Defendants had only just created.

It is undisputed that the USTA locker room attendants were short-staffed on the night of

7

Ms. Bouchard's accident.   (Ex. C, 53:10-54:25; Ex. K, 35:14-18.)   It is also undisputed that

when the locker room attendants were short staffed, as they were on the night of Ms. Bouchard's

accident, Karen Owens would personally help clean the locker room, including cleaning the floor

of the trainer's room where the accident occurred.   (Ex. C, 54:3-11; Ex. K, 34:3-35:13.)

Having played two matches that day and scheduled to play two matches the following

day, Ms. Bouchard felt it was imperative that she take an ice bath to help her recovery.   Ms.

Bouchard proceeded to change her clothes and head to the trainer's room with the intention of

taking an ice bath.   (Ex. A, 82:8-18.)   The door separating the women's locker room from the

trainer's room was wide open.   (Ex. A, 83:2-13.)   There were no caution or warning signs of

any kind in or around the trainer's room to indicate that the floor was slippery or had just been

cleaned.   (Ex. A, 83:25-84:4.)   After getting about three steps within the trainer's room, Ms.

Bouchard slipped and fell backwards and hit her head on the hard tile floor.   (Ex. A, 85:14-23,

87:13-17.)   Only after falling, did Ms. Bouchard determine that there was a slippery cleaning

substance on the trainer's room floor that caused her to slip and fall.   (Ex. A, 88:22-90:3.)   The

cleaning substance was burning Ms. Bouchard's skin so severely that she was even heard by one

of the locker room attendants screaming in pain.   (Ex. K, 54:17–23).   Ms. Bouchard rushed to

the shower to wash the cleaning substance off.   (Ex. K, 35:22-36:10, 54:17-25.)

**Defendants' Duty to Preserve Relevant Evidence and Institute a Litigation Hold.**

The USTA began conducting an internal investigation into Ms. Bouchard's accident the

very next day —September 5, 2015.   This investigation included, but was not limited to, having

the USTA's Senior Legal Counsel personally interview Ms. Bouchard's car service driver from

the night of her accident.   (Morelli Decl., **Exhibit D**, 35:12-36:14, 61:3-64:7; *see also* Morelli

Decl., Ex. B, 94:4-14, 96:2-14, 101:7-102:10; Morelli Decl., Ex. C, 63:22-65:8.)   The head of security for the U.S. Open personally escorted Ms. Bouchard's car service driver to the office of the USTA Senior Legal Counsel within the National Tennis Center.   (Ex. D, 70:25-71:24.)

On September 16, 2015, in anticipation of litigation, Plaintiff sent Defendants a preservation letter demanding that Defendants "*preserve all evidence relating to this incident, including, but not limited to, <u>any security camera footage of the locker room and surrounding areas</u>*." (Morelli Decl., **Exhibit E**.)   The preservation letter specifically demanded that Defendants "*cease any routine data destruction policies in place, and preserve all requested evidence in anticipation of litigation*." (Ex. E.)   Plaintiffs further stated that "*[f]ailure to preserve such evidence will constitute spoliation*." (Ex. E.)   A copy of Plaintiff's preservation letter was sent directly to at least two attorneys employed by the Defendants, the General Counsel for the USTA National Tennis Center and the Chief Administrative Officer and General Counsel for the USTA, among other executives employed by the Defendants.   (Ex. E.)   This letter was all Defendants needed to be duty bound to preserve all relevant evidence, especially the security camera footage of the locker room and surrounding areas, which was the very first item referenced in the letter.   By their prior actions, the Defendants proved that they knew the drill, but instead cherry-picked what evidence to preserve and what to intentionally destroy.

On October 14, 2015, Plaintiff filed her Complaint against the Defendants.   (Dkt. #1.) In Defendants' Rule 26(a)(1) Initial Disclosures dated December 21, 2015, Defendants attached as Exhibit 11, a CD entitled "09/04/15 Security Video – National Tennis Center (vicinity of Women's Locker Room)." (Morelli Decl., **Exhibit F**.)   The CD contained approximately three (3) hours of video footage from a single security camera positioned directly outside of the

women's locker room on the night of Ms. Bouchard's accident.   Defendants unilaterally chose

to produce this, and only this, security camera footage, despite there being additional security

cameras in the immediate areas surrounding the women's locker room that Defendants easily

could have and should have produced.

**Plaintiff Becomes Aware of Relevant Security Camera
Footage that Defendants Failed to Previously Disclose.**

On November 30, 2016, the deposition of WTA trainer Eva Scheumann was held in St.

Petersburg, FL.   (Morelli Decl., **Exhibit G**.)   Eva Scheumann was working as a WTA trainer

during the 2015 U.S. Open, including the night of Ms. Bouchard's accident, and her job title was

Senior Manager.   (Ex. G, 7:23-8:10, 61:24-62:20.)   During her deposition, Ms. Scheumann

admitted that she and the other WTA trainers were waiting in the women's locker room for Ms.

Bouchard to return from her press conference and take an ice bath.   (Ex. G, 32:7-18.)   After

waiting approximately one hour, Ms. Scheumann allegedly left the women's locker room to look

for Ms. Bouchard.   (Ex. G, 44:10-25.)   Ms. Scheumann allegedly looked for Ms. Bouchard in

the fitness center, the players' lounge, and in the area around the three interview/press

conference rooms.   (Ex. G, 45:1-25.)   Ms. Scheumann claimed she did not actually look inside

the *only* interview room that was in use at the time because she was supposedly not allowed in.

(Ex. G, 46:14-18.)

Ms. Scheumann allegedly asked one security guard at the door to the interview room if

Ms. Bouchard was inside, but the guard answered that she didn't know.   (Ex. G, 46:24-47:5.)

Ms. Scheumann allegedly then asked the security guard if she could go inside and look for Ms.

Bouchard, but the security guard told her "no."   (Ex. G, 47:10-18.)   At that point, despite there

being only one interview room in use, instead of taking any additional efforts to ascertain

10

whether Ms. Bouchard was still giving her press conference, Ms. Scheumann gave up her search and returned to the women's locker room.   (Ex. G, 47:23-25.)   Ms. Scheumann admitted that the only other two interview rooms were closed, so she did not bother to look for Ms. Bouchard there.   (Ex. G, 47:6-9.)   She also admitted that she does not recall how long she actually spent looking for Ms. Bouchard.   (Ex. G, 52:7-15.)   Video evidence, which we now know existed but was destroyed by the Defendants, would be decisive in determining the truth of the actions taken, or not taken.

After returning to the women's locker room, Ms. Scheumann informed the other WTA trainers that she could not find Ms. Bouchard and, only then, did they decide to leave for the night.   (Ex. G, 48:1-15.)   Ms. Scheumann directly contradicted the deposition testimony of Kristy Stahr and stated it was not her decision alone for the trainers to leave, but, rather, it was a group decision.   (Ex. G, 49:12-18.)   Despite standing right outside the door to the interview room where Ms. Bouchard was giving her press conference, Eva Scheumann testified under oath that she believed Ms. Bouchard had left for the evening and was not coming back.   (Ex. G, 50:17-21.)   Ms. Scheumann and the other WTA trainers left for the night at approximately 11:05 p.m.   (Ex. G, 82:8-83:19; Ex. M.)

Tellingly, however, despite testifying that she believed Ms. Bouchard had left for the evening, Ms. Scheumann admitted that she sent Ms. Bouchard an email at approximately 11:08 p.m. stating that all the trainers had left for the evening, but noted that they would return if Ms. Bouchard needed anything, including taking an ice bath.   (Ex. G, 62:21-63:9, 67:17-68:11, 115:10-25.)   This is clear evidence that she knew Ms. Bouchard was still at the National Tennis Center.   As shown above, Ms. Bouchard returned to the women's locker room a mere five

11

minutes after the trainers left, at approximately 11:10 p.m.   (Ex. A, 78:14-79:4; *see also* Ex. M.)

If Eva Scheumann had made an actual effort to ascertain that Ms. Bouchard was about to

conclude her press conference, or if the WTA trainers had waited merely five more minutes for

Ms. Bouchard to return, this entire accident would have been avoided.   Allowing Plaintiff to

confront these employees with the relevant video evidence would have proven this conclusively.

Eva Scheumann even admitted during her deposition that had she known that Ms.

Bouchard was still in the interview room, she would have waited for Ms. Bouchard to return to

take an ice bath.   (Ex. G, 124:3-11.)   Yet, Ms. Scheumann claimed there was absolutely nothing

else she could have done to ascertain Ms. Bouchard's whereabouts other than asking one security

guard outside the interview room whether Ms. Bouchard was inside.   (Ex. G, 125:4-8.)   Ms.

Scheumann claimed there were absolutely no USTA officials, USTA personnel, or anyone else

on the premises who she could have asked to determine Ms. Bouchard's whereabouts.   (Ex. G,

126:24-127:2.)   Plaintiff is unable to verify or disprove Ms. Scheumann's claims because the

USTA intentionally destroyed relevant security camera footage that cannot be restored or

replaced.

As shown above, during Ms. Scheumann's deposition it became clear that additional

security camera footage may exist which would be extremely relevant to substantiating a critical

timeline and supporting Plaintiff's claims in this action.   Specifically, during the critical time

period right before the WTA trainers left for the evening and the USTA locker room attendants

cleaned the floor, Ms. Scheumann claimed she was looking for Ms. Bouchard in various different

locations in areas near the women's locker room.   (Ex. G, 45:1-25.)   At her deposition, Ms.

Scheumann was shown various still frame photographs—from the single security camera footage

12

that Defendants unilaterally chose to produce—and testified repeatedly that she was "looking for

Genie" in various locations during that critical time period.   (Ex. G, 75:3-82:7.)   However, as a

direct result of Defendants' destruction of relevant security camera footage that cannot be

restored or replaced, Plaintiff is unable to verify any of Ms. Scheumann's claims.

**Defendants Intentionally Deprived Plaintiff of Relevant Security Camera Footage**
**By Failing to Preserve and Produce Said Footage, and Allowed it to be Destroyed.**

In direct follow-up to the information learned from Ms. Scheumann's deposition, Plaintiff

served a Third Rule 34 Request for Production of Documents on Defendants on November 23,

2017.   In this discovery demand, Plaintiff specifically requested additional security camera

footage from the night of Ms. Bouchard's accident which would substantiate Ms. Scheumann's

claims and be highly relevant to establishing a critical timeline.   This included footage capturing

the area outside the interview rooms where Ms. Bouchard gave her press conference.

On December 21, 2016, Defendants served their Responses to Plaintiff's Third Rule 34

Request for Production of Documents.   (Morelli Decl., **Exhibit H**.)   In response to Plaintiff's

request for additional security camera footage, Defendants inexplicably stated that none existed

because "[p]ursuant to Defendants' policy, security footage is only available within 160 days of

the recording.   *No further footage from 2015 exists beyond what was already provided by*

*Defendants*."   (Ex. H at 4.)   In other words, the Defendants' failed to institute a litigation hold,

intentionally destroyed this highly relevant security camera footage, and, consequently, deprived

Plaintiff of crucial evidence that cannot be restored or replaced through additional discovery.

**Defendants' Failure to Identify and Disclose the Locker Room Attendant Who**
**Actually Applied the Slippery Cleaning Substance on the Night of Plaintiff's Accident.**

Plaintiff is left in an extremely compromised position because of Defendants' intentional

conduct calculated to deprive Plaintiff of relevant evidence and is now left with no other remedy. This is not the first time Defendants' have played fast and loose with the evidence in this case. Since the inception of this litigation Defendants have engaged in a pattern of intentional conduct designed to frustrate Plaintiff's prosecution of this action.

In Defendants Rule 26 Initial Disclosures, they identified the only three USTA locker room attendants who were working in the women's locker room on the night of the accident. (Morelli Decl., Ex. F at 2-3.)   The three locker room attendants were supervisor Karen Owens, Christina Simmons, and Sandra Benavides.   (Ex. F.)   In response to Defendants' identification of these three potentially crucial witnesses, in Plaintiff's Rule 33 Interrogatories, Plaintiff requested that Defendants "[i]dentify the name and last known address of the locker room attendant or attendants who applied the [cleaning substance] to the floor of the [trainer's] room where Ms. Bouchard's accident occurred on the night of the subject accident."

In Defendants' Response to Plaintiff's Rule 33 Interrogatories dated June 16, 2016, Defendants stated that "one of the [three] locker room attendants on duty the evening of Ms. Bouchard's accident actually applied the [cleaning substance] to the floor of the [trainer's] room."   However, Defendants' went on to state definitively that the "Locker Room Supervisor, Ms. [Karen] Owens, did not apply the [cleaning substance]."   (Morelli Decl., **Exhibit I**.)   That led Plaintiff to believe that either Christina Simmons or Sandra Benavides must have applied the cleaning substance to the floor of the trainer's room.   There could be no other logical explanation – or so Plaintiff thought.

Presumably, Defendants were able to definitively state that "Locker Room Supervisor, Ms. Owens, did not apply the [cleaning substance]" because they interviewed her as part of the

14

USTA's investigation the morning immediately following Ms. Bouchard's accident.   (Morelli Decl., Ex. C, 63:22-65:8.)   Specifically, Karen Owens met with the USTA Senior Legal Counsel.   (Ex. C, 63:22-64:17.)   The in-person interview took place in the office of the USTA Senior Legal Counsel at the National Tennis Center.   (Ex. C, 64:18-25.)   The conversation lasted approximately one hour.   (Ex. C, 65:2-8.)

Ostensibly, it was during this one-hour meeting that Karen Owens informed the USTA that she did not personally apply the slippery cleaning substance to the floor of the trainer's room on the night of the accident.   Therefore, Defendants felt confident enough to definitively state such a fact in Defendants' Response to Plaintiff's Rule 33 Interrogatories, which were verified as true by Defendants' Chief Professional Tournaments Officer & U.S. Open Tournament Director. Yet, inexplicably, Defendants still refused to disclose which of the remaining two locker room attendants actually applied the cleaning substance.

Because the Defendants have put liability at issue in this case by failing to take responsibility for their actions, failing to concede liability, and by continuing to blame Ms. Bouchard in whole or in part for the accident, Plaintiff sought to take the depositions of all three locker room attendants in an effort to get to the bottom of when the cleaning substance was applied and by whom.   The deposition of locker room attendant Sandra Benavides was held on November 16, 2016.   (Morelli Decl., **Exhibit J**.)   Ms. Benavides testified definitively that she never cleaned the floor of the trainer's room throughout the entire 2015 U.S. Open.   (Ex. J, 31:5-9, 34:24-35:6.)   For the avoidance of doubt, she testified that she did not clean the floor of the trainer's room on the night of Ms. Bouchard's accident.   (Ex. J, 33:22-34:3.)   Ms. Benavides testified that she was unaware of who actually cleaned the floor on the night of Ms. Bouchard's

15

accident.   (Ex. J, 34:19-23.)

That left only one remaining locker room attendant – Christina Simmons.   During the deposition of supervisor Karen Owens, while under oath, Ms. Owens unequivocally identified Christina Simmons as the locker room attendant who applied the slippery cleaning substance to the floor of the trainer's room on the night of Ms. Bouchard's accident.   (Morelli Decl., Ex. C, 23:7-9, 40:22-41:5.)   Ms. Owens testified that she personally instructed Christina Simmons to clean the floor that evening.   (Ex. C, 23:10-24:2, 41:17-18, 45:16-20, 46:12-16.)   In fact. Karen Owens testified she was physically present in the trainer's room and witnessed Christina Simmons allegedly apply the cleaning substance.   (Ex. C, 49:8-11, 49:25-50:25, 66:2-13.)

It remains unclear why Defendants—who interviewed Karen Owens for approximately one hour on the day following the accident—were unable to disclose Christina Simmons as the individual who applied the substance in either their Rule 26 Initial Disclosures or Response to Plaintiff's Rule 33 Interrogatories, obviating the need for Plaintiff to only find out this critical information for the first time during Ms. Owen's deposition.   That proved, once again, Defendants' intent to conceal information as evidenced by their other actions.

When Plaintiffs requested that Defendants produce Christina Simmons for a deposition, Defendants claimed that they were unable to locate her, she no longer worked for the USTA and, thus, they could not produce her.   In any event, because Defendants were either unwilling or unable to produce Christina Simmons for a deposition, Plaintiff spent many months attempting to locate and subpoena Ms. Simmons for a deposition in order to get information firsthand from the locker room attendant who actually applied the slippery cleaning substance to the floor.   Finally, on April 20, 2017, the deposition of Christina Simmons was held.   (Morelli Decl., **Exhibit K**.)

16

Much to Plaintiff's surprise, Christina Simmons testified under oath that she *never* cleaned any floors during the entire 2015 U.S. Open.   (Ex. K, 17:21-25.)   Ms. Simmons had a completely legitimate reason for not cleaning floors during the 2015 U.S. Open.   She was seven-months pregnant at the time of the U.S. Open and her supervisor Karen Owens made the determination that Ms. Simmons should not be handling any strong chemicals, such as the type used to clean the floor of the trainer's room.   (Ex. K, 22:4-23:13.)   For the avoidance of doubt, Ms. Simmons definitively testified that on the night of Ms. Bouchard's accident she did *not* clean the trainer's room floor.   (Ex. K, 31:11-14.)   Instead, throughout the entire 2015 U.S. Open, Ms. Simmons' only responsibilities as a locker room attendant were doing the laundry, restocking towels, and helping the players with their lockers.   (Ex. K, 16:3-19, 17:2-16.)

When Christina Simmons was informed Karen Owens had identified her as the person who cleaned the floor of the trainer's room on the night of the accident, she testified as follows:

Q.   Okay.   Let me ask you this: Are you aware that Karen Owens testified under oath that you were the person who cleaned the floor of the trainers' room on the night of the accident?

A.   I found out since yesterday.

Q.   How do you feel about that?

A.   I can't believe that because that's a friend to me.

Q.   Do you know why Ms. Owens would say that you cleaned the floor on the night of the accident?

A.   I have no idea because she was the one when I was pregnant, she told me, oh, Ms. Simmons, don't do this, don't do that.

Q.   So Karen Owens told you not to clean the floor during the 2015 U.S. Open; is that true?

A.   Yes.

17

Q.  *So is it fair to say that Ms. Owens was not telling the truth when she stated that you cleaned the floor of the trainers' room on the night of the accident of the 2015 U.S. Open*?

A.  *Yes*.

(Ex. K, 31:23-33:2 (emphasis added)).

In other words, according to Christina Simmons, USTA employee Karen Owens lied under oath.   Ms. Simmons was not hired to work at the U.S. Open again in 2016, despite applying for a job, and is instead being made the scapegoat by the Defendants.   (Ex. K, 12:13-13:24.)   To this day, despite only three locker room attendants working on the night of Ms. Bouchard's accident, the Defendants have utterly failed to identify and disclose which of the three actually applied the slippery cleaning substance that caused Ms. Bouchard to fall.   This has made it impossible for the Plaintiff to delve into the cleaning process step-by-step, minute-by-minute, in order to seal the liability issues.

Defendants' conduct regarding the production of this witness, and its complete failure to identify and divulge the person who actually applied the substance on the night of the accident is illustrative of Defendants' failure to fairly and honestly litigate this case, and of their intentional concealment of pertinent information throughout this discovery process.   Upon taking a closer look at Defendants' supposed "investigation" of this incident and their course of conduct, it is almost unfathomable.   Less than twenty-four hours after Ms. Bouchard's accident, the USTA was already in litigation mode, and commissioned its Senior Legal Counsel to conduct an investigation.   The USTA knew that the Senior Legal Counsel's interviews and findings would be protected from disclosure in any impending litigation.   That is why the USTA engaged an attorney to conduct the interviews.   Did the USTA's Senior Legal Counsel make sure to gather

18

and preserve all relevant security camera footage?   No.   Did she identify and interview the individual who applied the cleaning substance that caused Ms. Bouchard's accident?   No.   Or worse, maybe yes, but Defendants failed to disclose that fact and, instead, engaged in a cover up.

What did the USTA's Senior Legal Counsel actually do during this supposed "investigation?"   She summoned for an interview the car service driver who drove Ms. Bouchard to the hospital immediately after her accident.   (Ex. D, 71:8–24).   The driver even testified that she was escorted by one of the heads of security at the U.S. Open for an interview with the Senior Legal Counsel investigating the matter.   (Ex. D, 70:25-71:24.)   This driver could not possibly have had any knowledge of how the accident occurred, as she was admittedly not present in the women's locker room at any time that evening.   The only purpose of interviewing the driver was to protect the USTA and disparage Ms. Bouchard and any potential claims she may have had.

The USTA Senior Legal Counsel did interview Karen Owens the day after the accident, the locker room supervisor who testified under oath at her deposition that Christina Simmons applied the cleaning substance to the floor.   The only inference that can be made is that, at that meeting, Karen Owens told the USTA Senior Legal Counsel the same information she later testified to under oath—that it was Christina Simmons who applied the cleaning substance.   If that was indeed true, why didn't the USTA's Senior Legal Counsel interview Christina Simmons during its "investigation?"   More importantly, why didn't the Defendants disclose this crucial fact immediately in either their Rule 26 Initial Disclosures or Response to Plaintiff's Rule 33 Interrogatories?   The Defendants should have found out this crucial fact independent of the interview with Karen Owens and informed the Plaintiff.   Yet, it is undisputed that the

Defendants did not interview the only two other locker room attendants working on the night of the accident, presumably because they did not want to know the truth.   Once Karen Owens told the Defendants' that she did not personally apply the cleaning substance, the USTA had its defense for this case.   The USTA decided what it needed to do to insulate itself from responsibility and then proceeded accordingly.   Disclosing only who did *not* clean the trainer's room floor – not who actually did – smacks of an intentional cover up.

In fact, the USTA did not even interview Christina Simmons about the accident at all during the remainder of the 2015 U.S. Open.   (Ex. K, 40:20-41:21.)   The first time the USTA even contacted Ms. Simmons was by phone a couple months after the accident.   (Ex. K, 9:15-23.)   During that phone call the USTA did not even discuss any specifics about the happening of the accident.   (Ex. K, 10:7-15.)   Moreover, the home address Defendants provided for Christina Simmons in their Rule 26 Initial Disclosures was incorrect and, as a result, the Plaintiff was forced to spend enormous time and expense locating Ms. Simmons.   Had the Defendants actually "investigated" the accident and interviewed Ms. Simmons immediately after the accident, Plaintiff could have been spared this time and expense.

The fact that the USTA intentionally obfuscated and impeded the Plaintiff's ability to litigate her case by failing to disclose crucial facts is inexplicable and their failure to preserve and maintain critical evidence is inexcusable.   The USTA's "litigation mode" was designed only to protect their company, not the evidence which they were legally obligated to preserve, nor to protect one of their star players.   It is hard to believe that an in-house attorney would be so involved in an accident investigation so quickly, conducting interviews with numerous witnesses, including a car service driver, but yet not preserve all relevant evidence.   The USTA must be

20

sanctioned for this intentional and inexcusable conduct with an adverse inference instruction. Anything short of this would allow the Defendants to get away scot-free for flouting the rules and prejudicing the Plaintiff's case.

**<u>Defendants' Intentional Concealment of All Applicable Insurance Coverage.</u>**

If the above conduct has not sufficiently established Defendants' pattern of intentional conduct designed to deprive the Plaintiff of relevant evidence, as part of its automatic Rule 26 Initial Disclosures, the Defendants were also required, *without awaiting a discovery request*, to provide the Plaintiff with "*any* insurance agreement" that may be applicable to satisfy a possible judgment in this action.   *See* Fed. R. Civ. P. 26(a)(1)(A)(iv) (emphasis added).   In Defendants' Rule 26(a)(1) Initial Disclosures, under the heading "[a]pplicable insurance agreements," the Defendants enclosed a single insurance policy which they claimed to be the only insurance policy applicable to this case.   (*See* Ex. F at 7.)   Under the false assumption that this single insurance policy was the only applicable insurance agreement, and in a good faith effort to settle this case, the Plaintiff spent time, money, and resources participating in two separate unsuccessful mediations.   Plaintiff participated in both mediations under the false assumption that the Defendants had disclosed all applicable insurance agreements as they were required to under the Federal Rules of Civil Procedure.

After the second unsuccessful mediation, Plaintiff inquired of the Defendants whether there might be any additional insurance coverage that had not been previously disclosed.   In response, for the very first time, and a full year and a half after Plaintiff's Complaint was filed, the Defendants disclosed three separate additional insurance policies that they had failed to disclose throughout the entire course of this litigation.   Indeed, only after Plaintiff's persistent

21

questioning of Defendants regarding the extent of the insurance coverage did it become clear that the amount initially disclosed was only a fraction of the actual insurance coverage.   After changing the amount of applicable insurance coverage three different times, it remains unclear to the Plaintiff whether the amount of insurance coverage disclosed by the Defendants is accurate and complete.   Defendants' intentional concealment of all applicable insurance policies despite two separate mediations could only have been done for one reason—to induce the Plaintiff to accept less than the true value of her case.   It is unbelievable to suggest that the corporate Defendants and their experienced attorneys were unaware of all applicable insurance policies until a year and a half after this case commenced.   Defendants' utter failure to disclose all applicable insurance agreements – until Plaintiff persisted – was in direct violation of the Federal Rules of Civil Procedure which require automatic and immediate disclosure of all insurance policies.   Defendants' course of conduct is part of a pattern of behavior designed to avoid responsibility for an accident that they caused and has been to the detriment of the Plaintiff. Such conduct should not be condoned by this Court and warrants sanctions in its own right.

Defendant's failure to disclose all available insurance coverage is evidence of their intent in not disclosing pertinent information throughout the discovery process, despite being under an obligation to do so.   Unlike Defendants' destruction of the relevant security camera footage, Defendants' failure to disclose the full extent of its insurance coverage will not prejudice Plaintiff during trial.   However, it is characteristic of Defendants' pattern and practice of intentionally concealing information in discovery that they are obligated to provide to Plaintiff. Defendants have brought this all upon themselves with their decisions to not take responsibility for the accident and to blame Ms. Bouchard in whole or in part.

## ARGUMENT

**I.     The Sanction of an Adverse Inference Jury Instruction is
Warranted because Defendants Intentionally Deprived
Plaintiff of Highly Relevant Security Camera Footage that
Cannot be Restored or Replaced through Additional Discovery.**

### A.  Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).   A court may impose

sanctions against a party who spoliates evidence pursuant to Fed. R. Civ. P. 37 as well as through

the Court's inherent powers to control the judicial process and the litigation before it.   *See*

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002); *see also*

*West*, 167 F.3d at 779 ("Even without a discovery order, a district court may impose sanctions

for spoliation, exercising its inherent power to control litigation.").   The applicable sanction

"should be molded to serve the prophylactic, punitive, and remedial rationales underlying the

spoliation doctrine."   *West*, 167 F.3d at 779.   Stated another way, the selected sanction should

be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous

judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the

same position he would have been in absent the wrongful destruction of evidence by the

opposing party."   *Id.* (internal quotation marks omitted).

"The duty to preserve evidence 'arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence may be relevant to

future litigation.'"   *Field Day, LLC v. Cty. of Suffolk*, No. CIV.A. 04-2202, 2010 WL 1286622,

at *3 (E.D.N.Y. Mar. 25, 2010) (quoting *Fujitsu Ltd. v. Fed'l Express Corp.*, 247 F.3d 423, 436

(2d Cir. 2001)); *see also Siani v. State Univ. of N.Y. at Farmingdale*, No. CV09-407 JFB WDW, 2010 WL 3170664, at *6 (E.D.N.Y. Aug. 10, 2010) (receipt of letter informing defendants of intent to pursue claim triggered duty to preserve); *Schwarz v. FedEx Kinko's Office and Print Servs., Inc.*, No. 08-CV-6486, 2009 WL 3459217, at *6 (S.D.N.Y. Oct. 27, 2009) (duty to preserve evidence arose when party received letter that gave it "good reason to anticipate imminent litigation"); *Creative Res. Gr. of New Jersey, Inc. v. Creative Res. Grp*., 212 F.R.D. 94, 106 (E.D.N.Y. 2002) (concluding duty to preserve arose months prior to the commencement of the lawsuit when the problems that eventually led to the filing of the lawsuit first surfaced).

Although it is now well-established that "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents," *Zubulake v. UBS Warburg LLC* ("*Zubulake IV*"), 220 F.R.D. 212, 218 (S.D.N.Y. 2003), the duty to preserve existed well before the litigation hold requirement was developed through the Second Circuit's jurisprudence.  *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107–08 (2d Cir. 2001) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).   Plaintiff submits that Defendants' obligation arose within twenty-four hours of Ms. Bouchard's accident when the USTA Senior Legal Counsel began interviewing possible witnesses, including the driver who drove Ms. Bouchard to the hospital after her accident.   Pursuant to this obligation, "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary."  *Zubulake IV*, 220 F.R.D. at 217.   The failure to issue a written litigation hold, may be considered particularly egregious "because that failure is likely to result in the destruction of relevant information."  *Pension Comm. of Univ. of Montreal Pension Plan*

24

*v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010).[1]   Here, there can be no dispute that the missing security camera footage is relevant and useful to the Plaintiff.

A Court may impose a variety of sanctions for the spoliation of evidence, including judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorneys' fees and costs.   *See Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048 (GEL)(JCF), 2005 WL 1925579, at *4 (S.D.N.Y. Aug. 11, 2005) (citations omitted).   Importantly, the spoliation of evidence "can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."   *Zubulake v. UBS Warburg LLC* ("*Zubulake V*"), 229 F.R.D. 422, 430 (S.D.N.Y. 2004).   In sum, "[w]hile a litigant is under no duty to keep or retain every document in its possession[,] it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."   *Zubulake IV*, 220 F.R.D. at 217.

In its response to Plaintiff's pre-motion letter for sanctions (Dkt. #23), Defendants made the misguided argument that they "followed their standard retention policies with respect to all documents and video footage within its 43-acre facility."   Defendants' argument was made up out of whole cloth.   Defendants cannot be reasonably arguing that the preservation of a few additional security videos from the area immediately surrounding the women's locker room on

---

1 The Second Circuit rejected that portion of *Pension Committee* holding that the failure to institute a litigation hold constitutes gross negligence per se.   *See Chin v. Port Auth. of N.Y. & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). Instead, the court determined that the "'better approach is to consider the failure to adopt good preservation practices as one factor' in the determination of whether discovery sanctions should issue." *Id.* (alterations omitted) (quoting *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010)).   *Chin* did not adopt or endorse any other portion of the *Orbit One* decision, nor did it comment on any other portion of the *Pension Committee* decision. *See id.*

the night of Ms. Bouchard's accident was unduly burdensome.   That is ludicrous.   Not to

mention that following "their standard retention policies" is the opposite of what the law requires

when a party reasonably anticipates litigation, such as Defendants did here.   For the USTA to

even suggest such an argument demonstrates that they have not, and are not, taking their

discovery obligations seriously.   Therefore, their argument must be disregarded in its entirety.

### B. Plaintiff is Entitled to an Adverse Inference Instruction Pursuant to Fed. R. Civ. P. 37(b).

Plaintiff is unquestionably entitled to an adverse inference instruction pursuant to Fed. R.

Civ. P. 37(b) as a result of Defendants' at least grossly negligent conduct in destroying the

relevant security camera footage.   Pursuant to Fed. R. Civ. P. 37(b), a party seeking sanctions

for spoliation, including an adverse inference jury instruction, must establish "(1) that the party

having control over the evidence had an obligation to preserve it at the time it was destroyed; (2)

that the records were destroyed with a 'culpable state of mind'; and (3) that the destroyed

evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could

find that it would support the claim or defense."   *Residential Funding Corp.*, 306 F.3d at 107.

In this Circuit, "the 'culpable state of mind' factor is satisfied by a showing that the

evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or

negligently.'"   *Residential Funding Corp.*, 306 F.3d at 108.   A party is negligent even if the

failure "results from a pure heart and an empty head."   *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D.

297, 314 (S.D.N.Y. 2013).   "It follows that gross negligence also satisfies the culpability

requirement."   *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 503 (S.D.N.Y. 2013) (citation

omitted).   "Gross negligence has been described as a failure to exercise even that care which a

careless person would use."   *Williams v. N.Y. City Transit Auth.*, No. 10 CV 0882 ENV, 2011

WL 5024280, at *7 (E.D.N.Y. Oct. 19, 2011) (internal quotations omitted).

Relevance may be presumed when a party intentionally destroys materials without attempting to preserve the relevant information.  *See Dataflow, Inc. v. Perrless Ins. Co.*, 2013 WL 6992130, at *8 (N.D.N.Y. June 6, 2013).   "In this respect, 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'"  *Orbit One Communications, Inc.*, 271 F.R.D. at 436 (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). "When evidence is destroyed willfully, the destruction alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."  *Sekisui American Corp.*, 945 F. Supp. 2d at 504 (internal quotations omitted). "[T]he intentional destruction of relevant records, either paper or electronic, after the duty to preserve has attached, is willful."  *Pension Committee of University of Montreal Pension Plan*, 685 F. Supp. 2d at 465.   "The law does not require a showing of malice to establish intentionality with respect to the spoliation of evidence.   In the context of an adverse inference analysis, there is no analytical distinction between destroying evidence in bad faith, *i.e.,* with a malevolent purpose, and destroying it willfully."  *Sekisui American Corp.*, 945 F. Supp. 2d at 506 (citation omitted).

While the failure to timely institute a litigation hold does not necessarily constitute gross negligence *per se*, (*Chin*, 685 F.3d 135), the facts here clearly establish that the Defendants' complete failure to take even the most basic preservation steps, even after conducting their own investigation, receiving Plaintiff's preservation letter, and unilaterally producing only three hours of security camera footage from a single camera, constitutes at least gross negligence. Defendants' obligation to institute a litigation hold arose when they began their "investigation"

less than twenty-four hours after Ms. Bouchard's accident.   One of the most fundamental and

basic steps to implement during a litigation hold is to preserve potentially relevant video footage.

Additionally, Plaintiff's preservation letter explicitly directed Defendants to preserve security

camera footage of the locker room and surrounding areas.   Defendants' selective investigation

and failure to identify, preserve, and produce relevant video tapes, along with their clear pattern

and practice of obfuscating and impeding Plaintiff's discovery efforts throughout this litigation

demonstrates Defendants' gross negligence and intent to deprive Plaintiff of discovery.

> **C.  Plaintiff is Entitled to an Adverse Inference Instruction
> Pursuant to Fed. R. Civ. P. 37(e) because Defendants Pattern and
> Practice of Egregious Discovery Abuses Throughout this Case
> Illustrates and Supports Plaintiff's Claims that Defendants'
> Destruction of the Security Camera Footage was Intentional.**

As of December 1, 2015, Fed. R. Civ. P. 37(e) governs a party's failure to preserve

electronically stored information.[2]   Fed. R. Civ. P. 37(e) permits a Court to order sanctions

when information is lost "*because a party failed to take reasonable steps to preserve it, and it*

*cannot be restored or replaced through additional discovery.*"[3]   Fed. R. Civ. P. 37(e) (emphasis

added).   In short, this rule applies when electronic information should have been preserved in

---

2 In his order transmitting the proposed rule amendments to Congress, Chief Justice of the Supreme Court of the United States John G. Roberts stated that "'the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending.'"   *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495–96 (S.D.N.Y. 2016) (quoting 2015 U.S. Order 0017).   Plaintiff's Complaint in this action was filed on October 14, 2015, and, therefore, was pending prior to Fed. R. Civ. P. 37(e) taking effect.   However, Plaintiff submits that under whichever Rule this Court feels is appropriate to apply to the instant motion – Fed. R. Civ. P. 37(b), Rule 37(e), or the Court's inherent power to control litigation – sanctions of an adverse inference jury instruction and punitive monetary sanctions are warranted.

3 Fed. R. Civ. P. 37(e) provides in full: "If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."

the anticipation or conduct of litigation, a party failed to take reasonable steps to preserve the information, information was lost as a result, and the information could not be restored or replaced through additional discovery.   *See* Advisory Committee Notes to 2015 Amendment to Fed. R. Civ. P. 37(e).   Where party that failed to preserve the electronically stored information "acted with the intent to deprive another party of the information's use in the litigation," the Court may "instruct the jury that it may or must presume the information was unfavorable to the party" or "dismiss the action or enter a default judgment."[4]   Fed. R. Civ. P. 37(e)(2).

    Here, the evidence overwhelmingly supports Plaintiff's allegations that the Defendants intentionally destroyed the security camera footage at issue.   The Defendants' obligation to preserve the relevant security camera footage and institute a litigation hold arose no later than September 16, 2015, when they received Plaintiff's preservation letter.   In fact, Defendants' obligation almost certainly arose the day after Plaintiff's accident when they began conducting their own internal investigation.   Instead of fulfilling its obligations identifying and preserving all relevant security camera footage, Defendants knowingly discarded all additional security camera footage from the night of Plaintiff's accident, without taking any steps to institute a litigation hold and cease routine data destruction policies.   The relevance of this evidence should be presumed as Defendants failed to take any steps, much less reasonable ones, to preserve the security footage and, now, by Defendants' own admission, the evidence cannot be restored or

---

4 Arguably, Fed. R. Civ. P. 37(e) applies only to situations where "a party failed to take reasonable steps to preserve" electronic stored information, not to situations where, as here, a party intentionally deleted security camera footage.   *See Hsueh v. N.Y. State Dep't of Fin. Servs.*, No. 15 CIV. 3401 (PAC), 2017 WL 1194706, at *4 (S.D.N.Y. Mar. 31, 2017) (concluding Fed. R. Civ. P. 37(e) did not apply because the considerations in adopting Fed. R. Civ. P. 37(e) were inapplicable where the offending party took specific action to delete the electronically stored information, and awarding an adverse inference).   If Fed. R. Civ. P. 37(e) does not apply, the Court may rely on its inherent power to control litigation in imposing spoliation sanctions.   *Id.*

replaced.   This spoliation of evidence supports the sanction of an adverse inference jury instruction that the security camera footage would have been unfavorable to the Defendants.

The evidence that Defendants' intentionally deprived Plaintiff of relevant discovery is overwhelming.   For example: (1) Defendants were in a defensive litigation posture within twenty-four hours of the accident in an effort to protect themselves and disparage Ms. Bouchard; (2) during this so-called "investigation," Defendants intentionally chose to gather certain facts that they deemed relevant to the defense of their case and intentionally omitted gathering other evidence that proved relevant to Plaintiff's case; (3) Defendants, to this day, have utterly failed to conclusively identify which of their three employees applied the slippery cleaning substance that caused Ms. Bouchard's accident, despite being in a perfect position to do so; (4) Defendants unilaterally chose to maintain only a few hours of footage from a single security camera and admittedly destroyed all remaining security footage from the night of Ms. Bouchard's accident, despite being on clear notice to preserve all such evidence and having a legal obligation to do so; and (5) Defendants' concealed all applicable insurance policies until a year and a half into the litigation, despite being required to disclose them at the inception of this case.

There is clear and convincing evidence, then, that the Defendants destroyed the security camera footage here in order to gain an advantage in the litigation.   To be sure, that evidence is largely circumstantial.   "But circumstantial evidence may be accorded equal weight with direct evidence, and standing alone may be sufficient to support even a determination that requires proof beyond a reasonable doubt."   *CAT3, LLC*, 164 F. Supp. 3d at 500 (citations omitted). Here, no reasonable person can look at this overwhelming evidence and not find intent.   It defies logic that viewed as a whole, the destruction of the security camera footage combined with

Defendants other conduct was not intentional.   If Defendants' are allowed to get away with

continually flouting their discovery responsibilities, their actions are condoned and Plaintiff is

prejudiced without recourse.   Defendants' began their "investigation" with interviews that were

surgically conducting by the USTA's in-house counsel.   Yet even when Defendants' retained

outside counsel, these infractions were not cured.   Since this accident, Defendants have

employed the same methodology designed to obscure and impede Plaintiff's ability to litigate her

case in the normal course.   Defendants' continued insistence on blaming Ms. Bouchard in whole

or in part has made this evidence – that they destroyed – essential in this case.   Not only did

Defendants control the physical evidence, but they control whether it is relevant by continuing to

fail to concede liability.   If an adverse inference is not an appropriate remedy in this case,

Plaintiff submits that it is not appropriate in any case.   These findings clearly provide the basis

for Plaintiff's relief of an adverse inference instruction under Fed. R. Civ. P. 37(e).

> **D. Plaintiff is also Entitled to an Adverse Inference Instruction
> Pursuant to this Court's Inherent Authority to Control the Litigation.**

This Court also has the inherent power and authority to impose sanctions for Defendants'

bad faith spoliation of evidence.   *See CAT3, LLC*, 164 F. Supp. 3d at 497; *see also Ceglia v.*

*Zuckerberg*, 600 F. App'x 34, 36 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 823, 193 L. Ed. 2d 717

(2016) ("A court has inherent power to fashion an appropriate sanction for conduct which abuses

the judicial process.").   "Where exercise of inherent power is necessary to remedy abuse of the

judicial process, it matters not whether there might be another source of authority that could

address the same issue." *CAT3, LLC*, 164 F. Supp. 3d at 498.   Thus, sanctions are available

here under this Court's inherent authority even if Rule 37(e) did not apply.   *Id.   See Hsueh*,

2017 WL 1194706, at *4 ("Because Rule 37(e) does not apply, the Court may rely on its inherent

power to control litigation in imposing spoliation sanctions.") (citing *West*, 167 F.3d at 779).

### E.  Plaintiff has been Prejudiced by Defendants' Destruction of Evidence.

Plaintiff has been extremely prejudiced by the Defendants' destruction of the security camera footage.   Not only would the destroyed security camera footage have aided Plaintiff in gaining additional information relevant to her case, but the footage would have corroborated the Plaintiff's account of events on the night of her accident and disproven the claims of the Defendants and their witnesses.   The Plaintiff has also been prejudiced by the destruction of highly relevant security camera footage because it has made it impossible for the Plaintiff to delve into the cleaning process step-by-step, minute-by-minute, in order to seal the liability issues.   Further, Plaintiff has been unable to confront witnesses, such as Eva Scheumann, regarding their account of the night's events and definitively establish a critical timeline of the events leading up to Ms. Bouchard's accident.   Moreover, the Plaintiff has been put to the burden and expense of ferreting out the malfeasance and seeking relief from the Court.

Moreover, by Defendants own admission, it is clear that additional discovery will not rectify Defendants' failure to preserve the security camera footage, which weighs heavily in favor of finding prejudice and warrants an adverse inference instruction.   *See Beers v. Gen. Motors Corp.*, No. 97-CV-482(NPM/DNH), 1999 WL 325378 (N.D.N.Y. May 17, 1999) (dismissing complaint where spoliation of evidence had robbed defendant of the ability to defend against the action); *cf. Field Day, LLC*, 2010 WL 1286622, at *14 ("[I]t is unclear that Plaintiffs suffered any prejudice as destroyed documents apparently have been otherwise obtained") (citing *Pension Committee of University of Montreal Pension Plan*, 685 F. Supp. 2d at 478 ("While many of these documents may be relevant, the Citco Defendants suffered no prejudice because all were eventually obtained from other sources.")); *SJS Distribution Sys., Inc. v. Sam's E., Inc.*,

No. 11 CV 1229 WFK RML, 2013 WL 5596010, at *5 (E.D.N.Y. Oct. 11, 2013) (adverse

inference not warranted where "other evidence is still available to defendant") (citing *Golia v.*

*Leslie Fay Co.*, No. 01 CIV. 1111 (GEL), 2003 WL 21878788, at *10 (S.D.N.Y. Aug. 7, 2003)

(finding that the spoliator's "misconduct has not robbed [the opposing party] of the only evidence

on which they could base their case")).   In contrast to the cases cited above, here, as admitted by

the Defendants, the Plaintiff cannot obtain the security camera footage from any other sources

because "*[n]o further footage from 2015 exists beyond what was already provided by*

*Defendants*."   (Ex. H at 4 (emphasis added)).

### F.   The Sanction of an Adverse Jury Instruction is Warranted for Defendants' Failure to Preserve the Security Camera Footage.

Under either Fed. R. Civ. P. 37(e) or this Court's inherent authority, an adverse inference

is the appropriate remedy in this case.   Plaintiff has demonstrated that: (1) Defendants were

obligated to preserve the security camera footage; (2) intentionally destroyed the security camera

footage; and (3) the missing security camera footage that is relevant to the Plaintiff's claims in

this lawsuit cannot be restored or replaced through additional discovery.   These findings provide

the basis for relief under Rule 37(e)(1).   First, each of the threshold requirements of the rule is

met.   The security camera footage is plainly "electronically stored information."   There is no

dispute that the Defendants were obligated to preserve the security camera footage in connection

with this litigation.   As discussed above, the evidence was permanently destroyed and cannot be

adequately "restored or replace."   Clearly the Defendants destruction of the security camera

footage is not consistent with taking "reasonable steps" to preserve the evidence.

The prerequisite for the sanction of an adverse inference instruction under subsection

(e)(2) has been met as well.   The evidence proves that the Defendants "acted with the intent to

deprive [Plaintiff] of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).   In light of the evidence here, imposition of an adverse inference is an available sanction under Rule 37(e)(2).   One of the purposes of an adverse inference is to restore the prejudiced party to the same position it would have been in absent the wrongful destruction of evidence by the opposing party.   *See SJS Distribution Systems, Inc.*, 2013 WL 5596010, at *5.   In this case, an adverse inference is the only sanction that would restore Plaintiff to such a position.

Accordingly, Plaintiff respectfully requests that the Court order all appropriate sanctions, including, but not limited to, an adverse inference instruction directing the jury to presume that the missing security camera footage was both relevant and favorable to the Plaintiff's case, and that they may apply this inference, as well as the circumstances surrounding the destruction, against the Defendants in determining the merits of the case.   Moreover, Plaintiff should be awarded appropriate punitive monetary sanctions, including attorneys' fees and costs in connection with this motion.[5]

---

5 The Court has discretion to award attorneys' fees and costs in connection with spoliation motions "'to punish the offending party for its actions and deter the litigant's conduct, sending the message that egregious conduct will not be tolerated.'" *Field Day, LLC*, 2010 WL 1286622, at *14 (quotation omitted); *see also* Fed. R. Civ. P. 37(a)(5)(A); *Matteo v. Kohl's Dep't Stores, Inc.*, 533 F. App'x 1, 3 (2d Cir. 2013) (affirming district court's decision to award $10,686.60 in attorneys' fees in connection with a spoliation motion); *Skyline Steel, LLC v. PilePro, LLC*, No. 13-CV-8171 JMF, 2015 WL 3739276, at *8 (S.D.N.Y. June 15, 2015) (awarding $103,818.23 in attorneys' fees in connection with spoliation motion that was only partially successful); *Field Day, LLC v. Cty. of Suffolk*, No. CIV. A. 04-2202, 2010 WL 5490990, at *1 (E.D.N.Y. Dec. 30, 2010) (awarding $97,659.51 in attorneys' fees in case where it was unclear that plaintiffs suffered any prejudice as a result of spoliation, but an award of monetary sanctions for the amount of reasonable attorneys' fees and costs incurred in connection with the motion was warranted).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant her

motion, pursuant to Fed. R. Civ. P. 37 and this Court's inherent authority, for sanctions due to

Defendants' spoliation of evidence in its entirety.

Dated: New York, New York
        May 16, 2017

MORELLI LAW FIRM, PLLC

By:

        Benedict P. Morelli
        EDNY Bar No.: BM6597
        bmorelli@morellilaw.com
        David T. Sirotkin
        EDNY Bar No.: DS4863
        dsirotkin@morellilaw.com
        Perry S. Fallick
        EDNY Bar No.: PF1165
        pfallick@morellilaw.com
        777 Third Avenue, 31st Floor
        New York, New York 10017
        Tel: (212) 751-9800
        Fax: (212) 751-0046

        *Attorneys for Plaintiff Eugenie Bouchard*

TO:     **WILSON, ELSER, MOSKOWITZ,
        EDELMAN & DICKER LLP**
        Rosario M. Vignali, Esq.
        1133 Westchester Avenue
        White Plains, New York 10604
        (914) 872-7250

        *Attorneys for Defendants*

35