**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EUGENIE BOUCHARD | ) | Docket No. 1:15-cv-5920-AMD-MDG |
| | ) | |
| Plaintiff, | ) | Judge Ann M. Donnelly |
| v. | ) | |
| | ) | Magistrate Judge Lois Bloom |
| UNITED STATES TENNIS ASSOCIATION, | ) | |
| INC. and USTA NATIONAL TENNIS CENTER, | ) | |
| INC. | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SANCTIONS**

Respectfully Submitted,

_____S/_____
Rosario M. Vignali, Esq. (RMV7150)
Francis P. Manchisi, Esq. (FPM2943)
**Wilson, Elser, Moskowitz, Edelman &
Dicker LLP**
Attorneys for Defendants
United States Tennis Association
Incorporated and USTA National Tennis
Center Incorporated
1133 Westchester Avenue
White Plains, New York 10604
Tel. (914) 872-7250
Fax (914) 323-7001

Dated: May 30, 2017

6528950v.3

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ………………………………………………………1

DEFENDANTS' PROCEDURAL POSTURE AND COUNTER-STATEMENT
OF FACTS ……………………………………………………………………………..2

LEGAL STANDARD ……………………………………………………………………5

POINT I - DEFENDANTS ABIDED BY THEIR DUTY TO PRESERVE RELATED
EVIDENCE AND PRODUCED EVERYTHING REQUESTED BY PLAINTIFF …..………6

    A.  All Requested Camera Footage was Produced …………………………..…….…….7

    B.  There are no Cameras in Some of the Areas Claimed by Plaintiff ………………..…11

POINT II - PLAINTIFF HAS NOT ESTABLISHED THAT THE EVIDENCE SOUGHT
BY THE PLAINTIFF WAS DESTROYED OR LOST INTENTIONALLY OR IN
BAD FAITH ……………………………………………………………………………14

POINT III - PLAINTIFF HAS FAILED TO ESTABLISH THAT THE CAMERA
FOOTAGE IS RELEVANT OR MATERIAL TO HER CLAIMS ……………………………..18

POINT IV - PLAINTIFF'S HAS NOT SUFFERED PREJUDICE AS A RESULT OF
THE ALLEGED DESTRUCTION OF THE CAMERA FOOTAGE …………………….…...21

POINT V - PLAINTIFF HAS NOT ESTABLISHED THAT SHE IS ENTITLED TO ANY
SANCTION, INCLUDING PUNITIVE MONETARY SANCTIONS …………………………24

POINT VI - PLAINTIFF HAS INTRODUCED EXTRANEOUS AND IRRELEVANT
ARGUMENTS IN AN ATTEMPT TO PUT DEFENDANTS IN A BAD LIGHT AND
CONFUSE THE ISSUES BEFORE THE COURT ………………………………………………25

    A.  Disclosure and Testimony of Locker Room Attendants ……………………….……..25

    B.  Insurance Information ……………………………………………………..…………27

    C.  Playing "Fast and Loose" with Discovery …………………………………………28

CONCLUSION ………………………………………………………………………29

i

# TABLE OF AUTHORITY

**Cases**

*Byrnie v. Town of Cromwell,*
   243 F.3d 93 (2d Cir. 2001) …………………………………………………6, 7, 15, 18

*Curcio v. Roosevelt Union Free Sch. Dist.*,
   283 F.R.D. 102, 112 (E.D.N.Y. 2012) …………………………………………...7

*Fujitsu Ltd. v. Federal Express Corp.,*
   247 F.3d 423 (2d Cir. 2001) …………………………………………………...5, 6

*GenOn Mid-Atl, LLC v. Stone & Webster, Inc.*,
   282 F.R.D. 346, 353 (S.D.N.Y. Apr. 20, 2012) …………………………………..21

*Gleason v. Marriot Hotel Servs., Inc.*,
   No. 11 CV 6295, 2013 U.S. Dist. LEXIS 123967, 2013 WL 4573905 (S.D.N.Y. Aug. 26,
   2013) …………………………………………………………………………...16

*Goodyear Tire & Rubber Co. v. Haeger,*
   137 S. Ct. 1178, 2017 U.S. LEXIS 2613, 12 (U.S. Apr. 18, 2017) …………………………24

*Guity v. Uniondale Union Free Sch. Dist.*,
   2017 U.S. Dist. LEXIS 51964 (E.D.N.Y. Mar. 31, 2017) ………………………………..17

*Kronisch v. United States*,
   150 F.3d 112, 126 (2d Cir. 1998) ………………………………………………6, 18

*Lacey v. Target Corp.*,
   No. 13 CV 4098, 2015 U.S. Dist. LEXIS 62643, 16 (E.D.N.Y. May 12, 2015)……6, 7, 15-18

*Matteo v. Kohl's Dep't Stores, Inc.*,
   No. 09 CV 7830, 2012 U.S. Dist. LEXIS 32193, 2012 WL 760317
   (S.D.N.Y. Mar. 6, 2012) ………………………………………………………16

*Oakley v. Fed'n Emp't & Guidance Servs., Inc.*,
   No. 10 Civ. 7739, 2011 U.S. Dist. LEXIS 76896, 2011 WL 2946133,
   (S.D.N.Y. July 12, 2011) ………………………………………………………17

*Orbit One Commc'ns. Inc. v. Numerex Corp.*,
   271 F.R.D. 429, 431 (S.D.N.Y.2010)……………………………………………..21

*Reilly v. Natwest Mkts. Grp. Inc.,*
   181 F.3d 253 (2d Cir. 1999) ………………………………………………………17

ii

*Research Found. of State Univ. of N.Y. v. Nektar Therapeutics*,
   2013 U.S. Dist. LEXIS 68912 (N.D.N.Y. May 15, 2013) …………………………………..24

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002)…………………………………………………………7, 14, 24

*Simoes v. Target Corp.*,
   No. 11 CV 2032, 2013 U.S. Dist. LEXIS 83896, 2013 WL 2948083
   (E.D.N.Y. June 14, 2013) …………………………………………………………...17

*Treppel v. Biovail Corp.*,
   249 F.R.D. 111, 120 (S.D.N.Y. 2008) …………………………………………...6

*Twitty v. Salius*,
   455 Fed. Appx. 97, 99 (2d Cir. 2012)…………………………………………………..24

*Welsh v. United States*,
   844 F.2d 1239, 1246 (6th Cir. 1988) ……………………………………………………17

*West v. Goodyear Tire & Rubber Co.*,
   167 F.3d 776, 779 (2d Cir. 1999) …………………………………………………..5

*Zubulake v. UBS Warburg LLC*,
   220 F.R.D. 212, 219 (S.D.N.Y. 2003) …………………………………………………..6

*Zubulake v. UBS Warburg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004) …………………………………………………6, 7

**Rules**

Fed. R. Civ. P. 37(b) …………………………………………………………………...1

Fed. R. Civ. P. 37(e) ……………………………………………………………………14

Fed. R. Civ. P. 37(e)(1) …………………………………………………………………21

6528950v.3

## PRELIMINARY STATEMENT

Defendants, UNITED STATES TENNIS ASSOCIATION INCORPORATED and USTA NATIONAL TENNIS CENTER INCORPORATED, incorrectly named herein as "UNITED STATES TENNIS ASSOCIATION, INC. and USTA NATIONAL TENNIS CENTER, INC.," (hereinafter collectively referred to as "Defendants") respectfully submit this Memorandum of Law in Opposition to Plaintiff's Motion, pursuant to Fed. R. Civ. P. 37(b) and 37(e), seeking sanctions against Defendants for the alleged spoliation of evidence.[1]

In her Motion, Plaintiff alleges that Defendants have engaged in a "pattern" of concealing information, by: 1) allegedly failing to preserve "highly relevant security camera footage from the night of Plaintiff's accident"; 2) allegedly failing to disclose the "locker room attendant who actually applied the cleaning substance" on the night at issue; and 3) allegedly concealing the applicable insurance coverage. *See* Doc. 25-1, pp. 1-2. In so doing, however, Plaintiff distorts the procedural history of the case and conjures improprieties by Defendants that never occurred. Plaintiff engages in speculation and misstates facts – all while glossing over the voluminous relevant evidence and cooperation she has received from Defendants during the course of discovery in order, quite simply, to portray Defendants in a bad light. By accusing Defendants of playing "fast and loose" with the disclosure of information in this case and of having failed "to fairly and honestly litigate," Plaintiff publicly and without justification mischaracterizes Defendants' conduct on matters having nothing to do with the issues at hand – Defendants' security videos – in order to detract attention from the weakness of her own arguments. Plaintiff

---

[1] It must be noted that, in her motion, Plaintiff and her counsel have assumed the role of fact finder, automatically assuming the truth and validity of the very facts and allegations that are at issue in this case. Whether the evidence at issue was ever relevant or was destroyed with a culpable state of mind are questions for a jury to be resolved at trial, not via pre-summary judgment evidentiary motion. There is no reason why Plaintiff should not be required to prove every element of her claim to a jury.

1

has otherwise failed, in every respect, to establish that Defendants did not abide by their duty to preserve all *relevant* evidence.  Plaintiff has further failed to establish that Defendants acted with the requisite culpable state of mind when they did not preserve the sought-after security video, and failed to establish that such video (of areas that were *not* in proximity to the women's locker room) was somehow relevant to Plaintiff's claims.

For these reasons, it is respectfully submitted that Plaintiff's Motion should be denied in its entirety.

## DEFENDANTS' PROCEDURAL POSTURE AND COUNTER-STATEMENT OF FACTS

On the evening of September 4, 2015, at approximately 11 p.m., Plaintiff claims that she was injured when she slipped and fell on a slippery cleaning substance present on the floor of the physiotherapy room located *inside the women's locker room* at the National Tennis Center facility.

On or about September 16, 2015, less than two weeks after her accident, Plaintiff's counsel sent the USTA a correspondence where he requested preservation of "all evidence *relating to this incident*, including, but not limited to, any security camera footage *of the locker room and surrounding areas*."  *See Exhibit E to Plaintiff's Motion*, Doc. 26-5, p. 2 (emphasis added).  She then started this lawsuit on or about October 14, 2015, barely a month after the accident.

Defendants immediately engaged in full and comprehensive discovery, providing Plaintiff with a plethora of documents and responses to Interrogatories[2]:

---

[2]   In order to protect the privacy of those individuals identified in Defendants' discovery responses (including Plaintiff) and unlike Plaintiff (who electronically-filed, without redaction, various disclosures in this case containing the names and addresses of individuals and witnesses), Defendants have not attached copies of Defendants'

2

1. On or about December 21, 2015, Defendants served their Rule 26(a) Initial Disclosures and more than 20 exhibits, including the Arthur Ashe Stadium's floor plan, a schedule of 2015 US Open Prize Money, proof of prize money payment(s) made to Plaintiff, tournament draw sheets for the ensuing (post 2015 US Open) Asia tournaments, excerpts from the 2015 Official Grand Slam Rule Book, excerpts from the Grand Slam/WTA Ranking Contract and Services Agreement, the 2015 US Open schedule of play, the transcript of Plaintiff's post-match press conference on the evening of her accident and insurance declaration sheets.  Also included was a *security video* (over three hours in length) that was recorded by the security camera located directly outside the women's locker room, which is where Plaintiff's accident allegedly occurred.[3]  *See Exhibit F to Plaintiff's Motion*, Doc. 26-6, p. 5.

    In those Initial Disclosures, Defendants also identified numerous individuals who may have had discoverable information including, but not limited to, locker room attendants and WTA trainers.

2. On or about June 16, 2016, Defendants served their answers to Plaintiff's Rule 33 Interrogatories.  In so doing, Defendants produced additional documents, including personnel policies, the Women's Locker Room Schedule for the 2015 US Open, Employee sign-in sheet, and Player Handbook.

---

discovery responses to this Memorandum.  Defendants will obviously make them available to the Court for inspection upon request.

[3] For obvious reasons, there are no security cameras operating inside the women's locker room.

3

3. Also on June 16, 2016, Defendants served their Responses to Plaintiff's Rule 34 Request for Production of Documents.  With those responses, Defendants produced maintenance and cleaning services records.

4. On September 14, 2016, Kristy Stahr, a trainer with the Women's Tennis Association (WTA), a non-party, and Deborah Cleare (Plaintiff's driver on the night of the accident), were deposed.  Both witnesses had been identified about nine months before in Defendant's Initial Disclosures and their depositions were arranged through, or with the cooperation of, the Defendants and their counsel.

5. On or about October 19, 2016, Defendants served their Responses to Plaintiff's *Second* Rule 34 Request for Document Production, wherein Defendants produced video footage of Plaintiff's mixed doubles match and her singles match on the day of the accident, as well as footage of her press conference that took place on the evening of the accident.

6. On November 2, 2016, and at the request of Plaintiff's counsel, Defendants allowed Plaintiff's counsel to conduct an inspection of the National Tennis Center building and grounds.

7. On November 16, 2016, Karen Owens and Sandra Benavides, two of the locker room attendants, were deposed.  Both witnesses had been identified approximately one year earlier in Defendant's Initial Disclosures.

4

8. On November 30, 2016, Elaine Brady and Eva Scheumann, two WTA trainers working on the night of Plaintiff's accident, were deposed in Florida. Both witnesses had been identified approximately one year earlier in Defendant's Initial Disclosures. Their depositions were arranged and scheduled by Plaintiff's counsel in conjunction with counsel for the WTA.

9. On or about December 21, 2016, Defendants served their Responses to Plaintiff's *Third* Rule 34 Request for Production of Document, which was served on or about November 23, 2016, more than one year after the commencement of the litigation. In these timely responses, Defendants identified additional USTA employees and produced Timecard Reports for the three locker room attendants who were scheduled to work in the women's locker room on the night of the accident.

10. On April 20, 2017, Christina Simmons, the last of the three locker room attendants working on the evening of Plaintiff's accident, was deposed. Ms. Simmons had been identified in Defendants' Initial Disclosures more than a year earlier.

## LEGAL STANDARD

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d

5

423, 436 (2d Cir. 2001); *see also Lacey v. Target Corp.*, No. 13 CV 4098, 2015 U.S. Dist. LEXIS 62643, 16 (E.D.N.Y. May 12, 2015).  An adverse inference is "an extreme sanction and should not be imposed lightly."  *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008); *see also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003). A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following: 1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; 2) that the records were destroyed with a "culpable state of mind" and 3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.  *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004); *see Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001).


## POINT I

### DEFENDANTS ABIDED BY THEIR DUTY TO PRESERVE RELATED EVIDENCE AND PRODUCED EVERYTHING REQUESTED BY PLAINTIFF

A party has a duty to preserve evidence when it has "notice that the evidence is *relevant* to litigation, or should have known that the evidence might be relevant to future litigation" (emphasis added).  *Fujitsu Ltd. v. Fed Express Corp.*, 247 F.3d at 426.  Generally, the question of sanctions for spoliation arises in connection with the destruction of relevant evidence after a lawsuit has been commenced.  *See Kronisch v. United States*, 150 F.3d. 112, 126-27 (2d Cir. 1998).

As stated above, there are three prongs that Plaintiff must establish in this case in order to prevail on her Motion against Defendants.  First, Plaintiff must show that Defendants had control over the evidence and had an obligation to preserve it at the time it was destroyed. Second,

Plaintiff must show that Defendants had the requisite "culpable state of mind."  Third, Plaintiff must show that "the destroyed evidence was *relevant* to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense" (emphasis added). *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (*citing Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001).   Relevance "'means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence'." *Lacey v. Target Corp*., 2015 U.S. Dist. LEXIS 62643, 23 (E.D.N.Y. May 12, 2015) *quoting Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002).   Furthermore, the plaintiff "must show through extrinsic evidence that the destroyed evidence would have been favorable to its case." *Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 112 (E.D.N.Y. 2012) *citing Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. July 20, 2004).  When measured against this standard, it becomes clear that Plaintiff's claim of the alleged spoliation must be denied.

## A.  All Requested Camera Footage was Produced

In his correspondence of September 16, 2015, Plaintiff's counsel requested preservation of "all evidence *relating to this incident*, including, but not limited to, any security camera footage *of the locker room and surrounding areas*" (emphasis added).  There being no security video camera in operation where the Plaintiff's accident occurred – inside the women's locker room and, more specifically, the physiotherapy room located therein – the only security video camera footage that could possibly be related to Plaintiff's accident inside the locker room was the one directly *outside* the women's locker room door.  It was three-hours in length complete with a time/clock indicator and showed quite clearly who entered and exited the women's locker

room on the evening of the accident and at what time.  That security camera footage – of the area immediately outside the locker room– *is exactly what was produced by Defendants in this case as part of their Automatic Disclosures.*

Nearly 1 ½ years after receiving the footage of the security camera located outside the women's locker room, Plaintiff now complains about not receiving security camera video footage of other areas of the National Tennis Center facility and, somewhat hysterically, accuses Defendants of engaging in some kind of nefarious conduct in not preserving it.  However, the security video camera footage that Plaintiff now complains about: 1) was not related to the location of Plaintiff's accident; 2) was not related to Plaintiff's conduct at the time of the accident, and 3) was not related to the actions of Defendants' employees.  It is also entirely questionable whether such security video even existed to be preserved at all.

The evidence belies Plaintiff's claim that the area of the National Tennis Center's interview rooms, player lounge and fitness center were in the area "surrounding" the women's locker room and were, therefore, subject to the literal words of the request made for preservation in Plaintiff's counsel's letter of September 16, 2015.  As the Court is aware, Kristy Stahr and Eva Scheumann, trainers employed by the WTA (i.e. *not* employees of Defendants), gave sworn deposition testimony between mid-September and late November 2016 and Plaintiff herself was deposed in early November 2016.  *See Morelli's Declaration,* Doc. 26, ¶¶3.  As set forth in Plaintiff's own Motion, the net result of their testimony is that, *before* the accident, Plaintiff had a conversation with Ms. Stahr inside the women's locker room after her evening tennis match was completed.  She told Ms. Stahr of her plans to do her typical post-match "cool-down" exercises in the fitness center and her need to conduct a press conference with the waiting media before she expected to return to the women's locker room for her physiotherapy session with the

8

WTA trainers.  Plaintiff then provided unequivocal testimony as to the location of the fitness center and media center in relation to the women's locker room.  Plaintiff testified:

> Q.    Okay. And did you, in fact, go to the gym and spend some time there?
> A.    Yes.
> Q.    Okay. How far away is the gym from that locker room?
> A.    *It's down the hall and then three floors up.*

*See Exhibit A to Plaintiff's Motion,* 73:9-15 (Doc. 26-1, p. 12) (emphasis added).

As further conceded by Plaintiff in her Motion, after the "cool-down", Plaintiff proceeded to the press/interview rooms, which "are located *down the hall* from the women's locker room in the opposite direction from the fitness center."  *See Plaintiff's Motion,* p. 5 (Doc. 25-1) (emphasis added).  Thus, Plaintiff herself conceded that the fitness center and press rooms, and thus any security cameras close to them, were not located in areas "surrounding" the women's locker room where Plaintiff's accident happened.  No reasonable and objective observer would think that security camera video footage in areas "down the hall" and "three floors up" somehow comes within the purview of Plaintiff's counsel's request letter.

Plaintiff's claims that the fitness center and press/interview rooms were "surrounding areas" to the women's locker room and therefore within the purview of her counsel's request letter are again proven wrong when one examines the sworn testimony of Ms. Scheumann.  She testified that, after waiting for a period of time and before she and the rest of the WTA training staff left the facility for the evening, she went to look for Plaintiff in the players lounge, players fitness center and the media center -- all in an effort to determine whether Plaintiff would be actually returning for her physiotherapy treatment as she had previously indicated.  *See Excerpts from Deposition Transcript of Eva Scheumann*, annexed hereto as Exhibit "4", 45:1-4.  Specifically, Ms. Scheumann testified as follows:

> Q.    Okay. And, in fact, you waited, what – another about 11 – well, 10 or so

|      | minutes before you went and looked for her? |
| A. | Looked for her. |
| Q. | When you went to look for her, where did you look? |
| A. | I went into the media area where the press conference rooms are.  I went to the gym and to the player lounge. |
| Q. | Okay.  *Now, when you went to the – is this all on one level?* |
| A. | *No.* |
| Q. | *Okay. What's on a different level?* |
| A. | *Lounge, player lounge and gym.* |
| Q. | *How did you get to the player lounge?* |
| A. | *I go up one level.* |
| Q. | *Staircase?* |
| A. | *Yes.* |
| Q. | And when you got up to the player lounge area, did you see anyone? |
| A. | No. Nobody. |
| Q. | Was the light on in there? Was it light? Dark? |
| A. | I remember it being dark. |
| Q. | *Okay. And is it that same level where the gym is?* |
| A. | *No. The gym is one more.* |
| Q. | *Okay. So did you go up another set of stairs?* |
| A. | *Yes.* |
| Q. | And when you got up that second set of stairs, did you see anything? |
| A. | No. Nobody. |
| Q. | Nobody at all? |
| A. | Nobody at all. |
| Q. | Was the gym dark? |
| A. | Yes. |
| Q. | *Okay. So having gone to the second floor, to the third floor and seeing that everything is dark and there's no one there, did you then come back down --* |
| A. | *Yes.* |
| Q. | *-- to the first floor?* |
| A. | *Yes.* |
| Q. | When you came back down to the first floor, did you at that point determine that you can't find Ms. Bouchard? |
| A. | Yes. |

*See* Exhibit "4", 133:3-134:23 (emphasis added).  From this sworn testimony, one can see

that clearly that the areas at issue in Plaintiff's Motion are nowhere near the women's locker

room where Plaintiff's accident occurred.  Footage from security cameras located in those areas

would have been wholly unrelated to the location of the accident and to Plaintiff's claims of what

supposedly happened inside the women's locker room. Again, under what fair reading of the

facts in this case would the Defendants have had reason to believe that security camera video footage of these areas fall within the purview of Plaintiff's counsel's request letter of September 16, 2015?[4]

## B.  There are no Cameras in Some of the Areas Claimed by Plaintiff

Per the attached Affidavit of Michael Rodriguez, (Exhibit "5"), **t**he USTA Billie Jean King National Tennis Center ("Center") is a 42-acre facility comprising of several buildings and many outdoor facilities.  *See* Exhibit "5", ¶2.  The facility, both indoors and outdoors, is blanketed by a robust system of security measures, but certain areas are not completely covered by the system of security cameras in that the privacy of the players is taken into account.  *See* Exhibit "5", ¶3.  There are no security cameras, for example, in use inside the men's and women's locker rooms located on the first floor, or in the player lounge or player dining room located on the second floor.  *See id.*

The women's and men's locker rooms are located off an area that is known as the "Player Hallway," and within that area, there are security cameras located at the entrances to the men's and women's locker rooms.  *See* Exhibit "5", ¶4.  About 66 feet northeast from the women's locker room, and off the Player Hallway, is the player area and Purser's office both located on the first floor.  *See* Exhibit "5", ¶5.  The first floor player area contains, among other things, the player anti-doping room, practice court scheduling desk, and an area for racquet stringing.  *See id.*  Connected to the player area is a vestibule that contains the player transportation desk that

---

[4] As further evidenced by the Floor Plan of Arthur Ashe Stadium, (*see* Exhibit "1" herein),  interview room 1, interview room 2 and interview room 3 are all up the hallway and are located approximately 120 feet from the women's locker room (*see* Exhibit "1", "Ground Floor").  The player lounge is on the second floor of Arthur Ashe Stadium and the Fitness Center is on the third floor.  (*See* Exhibit "1", "Second Floor" and "Third Floor") In sum, the player lounge and Fitness Center were on *different floors*, and the interview rooms—albeit on the same floor as the women's locker room—were not in the proximity of the women's locker room.

leads to an outdoor garden exclusively used by players.  *See id.*  A security camera is located in the vestibule but is trained at the garden exit door.  *See id.*  Thus, any activities occurring within the 1st floor player area would not be captured by this camera. *See id.*

In this 1st floor player area there is a stairwell that leads to the 2nd floor, where the players lounge and players dining room are located.  *See* Exhibit "5", ¶6.  There are no security cameras in the stairwell, or in the hallway leading to the players lounge, or in the players lounge itself, or in player dining room. *See* Exhibit "5", ¶6.

The players' Fitness Center is located on the third floor.  *See* Exhibit "5", ¶7.  There are no cameras in the stairwell area leading from the second floor to the third floor or in the area approaching the players' Fitness Center.  *See* Exhibit "5", ¶7.  There are two cameras inside the players' Fitness Center, but they were not functioning during the 2016 US Open and have since been replaced.  *See* Exhibit "5", ¶7.  It is uncertain whether they were operational during the 2015 US Open.  *See* Exhibit "5", ¶7.

The Media Center and interview rooms are located at the southwest end of the Player Hallway.  *See* Exhibit "5", ¶8.  To reach the interview rooms from the women's locker room, one must pass the USTA NTC and USTA administrative offices.  *See* Exhibit "5", ¶8.  There is a security camera focused on the door of USTA NTC administrative office; however, because of the angle, this camera does not capture pedestrian activity in the Player Hallway.  *See* Exhibit "5", ¶8.  There is a security camera that faces the USTA administration office entrance, which captures pedestrian activity in the Player Hallway.  *See* Exhibit "5", ¶9.  However, the area of the Player Hallway captured by this camera is largely visible from, and duplicative of, the security camera video footage captured by the camera located just outside the women's locker room, which was already produced to Plaintiff. *See* Exhibit "5", ¶9.

There are no security cameras located outside the interview rooms, nor are there security cameras inside the interview rooms themselves.  *See* Exhibit "5", ¶10.

This description of the Center's security cameras and their placement also applies to the system in place during the 2015 US Open. *See* Exhibit "5", ¶11.

In 2015, all security camera video was maintained and preserved by the USTA NTC for a specified duration pursuant to established policy and procedure.   *See* Exhibit "5", ¶12. However, the only security camera video footage remotely related to Plaintiff's lawsuit – that from directly outside the women's locker room – *was* preserved and sent to the Plaintiff in December 2015 when Defendant's Automatic Disclosure was made.  At no time did she ask, nor did Defendants deny, whether or not additional security camera video footage might have existed until she asked for additional footage *about one year later* for purposes of confronting a witness not employed by, or under the control of, the USTA.

As evidenced by the facts, Plaintiff's cry that Defendants did not abide by their duty to preserve relevant evidence is utterly unjustified in that Defendants complied with their obligation to preserve evidence related to Plaintiff's accident. Under no fair reading of the law or Plaintiff's counsel's request letter of September 16, 2015 could it be said that Defendants had an obligation to preserve security camera footage from each and every single security camera in operation at the Center or any location other than the areas *inside* and/or *immediately outside* the women's locker room.  Stated otherwise, it would be completely unreasonable to place upon Defendants the burden to retain security camera video footage that was not even remotely and/or foreseeably related to the Plaintiff's accident.  Taking her position to its implausible and illogical conclusion, Plaintiff would have Defendants preserve *all* camera footage from *all* cameras within

13

its large multi-acre facility, even if those locations had *no relation whatsoever* to the accident. That position is plainly ridiculous and the law does not require such heightened duty.

**POINT II**

**PLAINTIFF HAS NOT ESTABLISHED THAT THE EVIDENCE SOUGHT BY THE PLAINTIFF WAS DESTROYED OR LOST INTENTIONALLY OR IN BAD FAITH**

A party's non- compliance with its obligation to preserve evidence is insufficient by itself to support an adverse inference charge or any other sanction.  Instead, the Federal Rules provide that the Court may provide for an adverse inference only upon a showing that the party acted with "intent to deprive another party of the information's use."  Fed. R. Civ. P. 37(e).  Under Rule 37 of the Federal Rules of Civil Procedure, specifically, an adverse inference instruction cannot be imposed unless the sanction is "necessary to cure the prejudice".  Where the sanction is not necessary to cure the prejudice, an adverse inference instruction can be imposed only where there was "intent to deprive" the other party of the evidence. To the extent that Plaintiff's Motion relies on it, the Second Circuit's *Residential Funding* negligence standard has therefore been overturned by the wording of Rule 37.  This did not happen by accident, but was the specific intention of the drafters of Rule 37(e), who noted that the Rule's language was specifically written to reject *Residential Funding*'s allowance of simple negligence to serve as the basis of an adverse inference[5].

---

[5] The Committee Note explained:

> "Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence.  Negligent or even grossly negligent behavior does not logically support that inference.  Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have.  The better rule for the negligent or grossly negligent loss of electronically stored information is to preserve a broad range of measures to cure prejudice caused by its loss, but to limit the most severe measures to instances of intentional loss or destruction."

14

In this regard, and even before Rule 37 was written, the Second Circuit had noted that the cases have required higher showings of culpability, such as intentional destruction of evidence, destruction in bad faith, or at least gross negligence before sanctions were actually imposed.  *See Byrnie v. Town of Cromwell*, 243 F.3d at 107-08 (citations omitted).

Here, Plaintiff cites much "smoke" but little "fire" in her veiled attempt to, somehow, show culpable conduct on Defendants' part.  The reality remains that Plaintiff has not established the requisite culpable state of mind to support the imposition of any sanction.

The security camera video footage which, at this late date, Plaintiff now seeks was not "lost", nor was it "destroyed".  It was not preserved pursuant to Defendants' normal and ordinary retention procedures then in place at the Center facility.  No culpable state of mind could possibly attach to the Defendants' employees simply carrying out their normal and everyday protocol as it related to the preservation of the security camera video footage.  Rather than accept Plaintiff's fanciful supposition that Defendants' legal team had nothing else to do in the Fall of 2015 than to review hours upon hours of security camera video footage from the Center facility to determine which footage should be retained and which should not be retained – all before anyone, namely Plaintiff and Ms. Scheumann, were even deposed in this case – the Court, respectfully, should focus on what *was* preserved and turned over to the Plaintiff.  Defendants did not act intentionally and with a culpable state of mind to deprive Plaintiff of relevant evidence. To the contrary, Defendants, in good faith and in full accord with the federal rules, turned over "related" security camera video from the "*locker room and surrounding areas*" exactly as Plaintiff requested in her counsel's letter of September 16, 2015.

A recent case from the Eastern District, remarkably similar to this one, is quite informative. In *Lacey v. Target Corp.*, No. 13 CV 4098, 2015 U.S. Dist. LEXIS 62643, 15

(E.D.N.Y. May 12, 2015), the plaintiff was walking in the main aisle of a Target store (known as the "racetrack"), when she slipped and fell.  Target produced security camera video footage of the Plaintiff's fall, both before and after it happened.  Plaintiff claimed that the video footage produced by Target was from an obscure side angle and that footage from numerous ceiling-mounted cameras had been destroyed by Target.  On these facts, the plaintiff cross-moved for spoliation sanctions against Target on the ground that Target had failed to preserve surveillance footage showing the aisle where the plaintiff had slipped.  In its defense, however, Target established that it had preserved and produced "a videotape of the exact moment when plaintiff slipped", thus, complying with its obligation to preserve footage of the accident.  *Id. at* 15-16*, citing Gleason v. Marriot Hotel Servs., Inc.*, No. 11 CV 6295, 2013 U.S. Dist. LEXIS 123967, 2013 WL 4573905, at \*2 (S.D.N.Y. Aug. 26, 2013) (a defendant is required to preserve video surveillance footage "'of plaintiff's accident'—put otherwise, the video that 'recorded [plaintiff's] fall'") (*quoting Matteo v. Kohl's Dep't Stores, Inc.*, No. 09 CV 7830, 2012 U.S. Dist. LEXIS 32193, 2012 WL 760317 (S.D.N.Y. Mar. 6, 2012)).  Target pointed out that it had a "video recycling policy" whereby videos not expressly preserved were deleted after 30 days.  *Id.*  Also, according to Target, not all of the dome ceiling cameras actually contained active cameras and the positions of the cameras changed periodically.  *See id.*  Once Target was notified of the accident, Target "captured forty minutes of video, including thirty-one minutes before the incident and nine minutes after."  *See id.*  Also, according to Target, there were no security cameras in the main aisle and the plaintiff failed to establish that other cameras would have covered the area.  *See id.*

The *Lacey* Court noted that, on the element of culpable state of mind, the Second Circuit determined that a "'case-by-case approach to the failure to produce relevant evidence' is

16

warranted since '[s]uch failures occur 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionally.''" *Lacey,* 2015 U.S. Dist. LEXIS 62643, 21 *quoting Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (*quoting Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)).  The Court acknowledged that Target was on notice of the potential claim as the plaintiff had filled out an accident report with the store after her fall.  *See id.* at 22. However, the Court found that the evidence was insufficient to find gross negligence on Target's part.  *See id.*  The Court found that even if plaintiff could show that Target destroyed footage of the incident, there was not enough evidence to prove that Target had acted with gross negligence in failing to preserve the footage.  *See id.; see also Simoes v. Target Corp.*, No. 11 CV 2032, 2013 U.S. Dist. LEXIS 83896, 2013 WL 2948083, at *6 (E.D.N.Y. June 14, 2013) (Target was not grossly negligent in allowing surveillance video to be recycled).  After considering the other elements of spoliation, the Court denied the plaintiff's motion.  *See also Guity v. Uniondale Union Free Sch. Dist.*, 2017 U.S. Dist. LEXIS 51964, 17-18 (E.D.N.Y. Mar. 31, 2017) (motion seeking sanctions for spoliation was denied where plaintiff failed to demonstrate that defendants destroyed evidence with a culpable mind);  *see Oakley v. Fed'n Emp't & Guidance Servs., Inc.*, No. 10 Civ. 7739, 2011 U.S. Dist. LEXIS 76896, 2011 WL 2946133, at *2 (S.D.N.Y. July 12, 2011) (denying the plaintiff's motion seeking sanctions for spoliation of evidence where the defendants "did not destroy any evidence with a culpable state of mind").

## POINT III

## PLAINTIFF HAS FAILED TO ESTABLISH THAT THE CAMERA FOOTAGE IS RELEVANT OR MATERIAL TO HER CLAIMS

"Where one seeks an adverse inference regarding the content of destroyed evidence, one must first show that 'the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed.'" *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) *quoting Kronisch*, 150 F.3d at 126. "Such an obligation usually arises when a 'party has notice that the evidence is *relevant* to litigation . . . but also on occasion in other circumstances, as for example when a party should have known that the evidence *may be relevant* to future litigation.'" *Byrne*, 243 F.3d at 107 *quoting Kronisch* 150 F.3d at 126 (emphasis added).

Thus, the alleged loss of any evidence will not give rise to a spoliation claim and resultant sought-after sanction, but only the loss of relevant evidence will do so. For Plaintiff to attempt to seriously argue that the security camera video footage located in different hallways and/or on different floors from where Plaintiff's accident occurred was somehow relevant to her claim is disingenuous at best. *See e.g., Lacey v. Target Corp.*, 2015 U.S. Dist. LEXIS 62643, 23-25 (E.D.N.Y. May 12, 2015) (plaintiff could not meet her burden of showing relevance as the sought-after video footage might have shown that a Target employee could have seen the foreign substance on the floor long before the accident and failed to remove it or, in the alternative, might have shown that the foreign substance made its way to the floor just moments before the accident; in this way, the sought-after video footage could have been favorable to either party's case).

In her Motion, Plaintiff recognizes that Defendants' facility is a multi-acre complex, but she then goes on to argue that preserving "a few additional videos" would not have been

18

burdensome to Defendants.  *See Plaintiff's Motion,* pp. 25-26.  Plaintiff's position, in reality, is a thinly-veiled argument that Defendant should have preserved security videos from *each and every camera* in its facility.  Indeed, when Plaintiff's counsel's letter of September 16, 2015 was sent, all that was known was that Plaintiff had fallen *inside* the women's locker room.  Videos from the entire facility, other than for what was preserved and produced, would have been wholly irrelevant to this case.[6]

It was not until many months later, and long after all other security camera video footage had no longer been preserved pursuant to the USTA/NTC's systems and procedure, that Ms Scheumann gave her testimony about her efforts to locate the Plaintiff on the grounds of the facility before she and the rest of the WTA training crew left for the evening.  As set forth herein, however, the areas that are at issue in Plaintiff's Motion and which would, according to Plaintiff, either corroborate or refute Ms. Scheumann's testimony, were nowhere near the women's locker room where Plaintiff's accident occurred.  As the evidence shows, the three interview rooms, the player lounge and the players Fitness Center were not in the proximity of the women's locker room.  *See* Exhibit "1", *see* Exhibit "5", ¶¶4-8.  Thus, it is disingenuous for Plaintiff to argue that any of these areas "surrounded" the women's locker room or were otherwise relevant to Plaintiff's claim or to the accident that took place within the locker room.

Regarding her ability to refute Ms. Scheumann's testimony,  Plaintiff would have the Court conveniently ignore that the security camera video footage that *was* produced by the Defendants clearly shows Ms. Scheumann leaving the women's locker room and traversing the corridor (first toward the players lounge and players' Fitness Center and then toward the area of

---

[6] One must wonder whether the Plaintiff would now be complaining of the video equivalent of a "document dump" if she was indeed provided with hundreds of hours of security camera video from locations all over the National Tennis Center complex.

the interview/press rooms) before returning to the women's locker room. As to other areas of the facility and Plaintiff's claim that she has been deprived of "relevant" evidence, it bears repeating that, as set forth in the Affidavit of Mr. Rodriguez, there are no security cameras in the stairwell area leading up to the second floor and the area of the players' lounge, nor is there a security camera in the players lounge itself.  *See* Exhibit "5", ¶6. There are no security cameras in the stairwell area leading from the second floor to the third floor and the area approaching the players' Fitness Center.  *See* Exhibit "5", ¶7. There are two security cameras inside the Fitness Center, although it is uncertain whether the two cameras were operational during the 2015 US Open. *See* Exhibit "5", ¶7.   Although there is a security camera that faces the USTA administration office entrance, this camera captures pedestrian activity in the Player Hallway; however, the area captured by this camera is largely visible from, and duplicative of, the security camera video footage captured by the camera located just outside the women's locker room, which was already produced to Plaintiff. *See* Exhibit "5", ¶9.   There are no security cameras located outside the interview rooms, nor are there security cameras inside the interview rooms themselves[7].  *See* Exhibit "5", ¶10.

Plaintiff's claim of being deprived of "relevant" evidence rings hollow and does nothing to support her claim for spoliation.

---

[7] At the request of the Plaintiff, Defendants produced video footage of Plaintiff's press conference.

20

**POINT IV**

**PLAINTIFF'S HAS NOT SUFFERED PREJUDICE AS A RESULT OF THE ALLEGED DESTRUCTION OF THE CAMERA FOOTAGE**

Fed. R. Civ. P. 37(e)(1) provides that: "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: *upon finding prejudice* to another party from loss of the information, may order measures no greater than necessary to cure the prejudice . . .". (emphasis added). A "court should never impose spoliation sanctions of any sort unless there has been a showing — inferential or otherwise — that the movant has suffered prejudice." *GenOn Mid-Atl, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 353 (S.D.N.Y. Apr. 20, 2012) *citing Orbit One Commc'ns. Inc. v. Numerex Corp.*, 271 F.R.D. 429, 431 (S.D.N.Y. 2010).

In the instant case, Plaintiff cannot bear the burden of proving that she has sustained prejudice, despite arguing that she needs the unpreserved security camera video footage to: 1) corroborate Plaintiff's account of the events; 2) "delve into the cleaning process step-by-step, minute-by-minute, in order to seal the liability issues;" and 3) confront witnesses, such as Eva Scheumann about their account of the events. *See Plaintiff's Motion,* p. 32. Frankly, these "straw man" arguments, upon analysis, don't hold water.

Firstly, the Plaintiff's account of the events outside the women's locker room is *not* in any significant dispute. The security camera video footage that was turned over to the Plaintiff shows her leaving and returning to the women's locker room at various recorded times. She testified that she did her post-match cool down in the players Fitness Center immediately after leaving the women's locker room for the first time, before heading over to the press area for her

21

post-match press conference.  It was upon returning to the women's locker room from the post-match press conference that her fall occurred.  That is Plaintiff's sworn testimony and Defendants have no reason to discredit it.  Thus, the parties know without question when Plaintiff was in the women's locker room and approximately when the actual fall occurred.

Secondly, the intricacies of the "cleaning process" used within the locker room are likewise immaterial to this case and, therefore, could not reasonably serve to form the basis of a "prejudice" claim and resultant sanctions. Defendants have never questioned that a cleaning substance was put down on the floor of the physiotherapy room area.  Moreover, information about the "why" and "how" of the floor cleaning process has been provided in this case through the sworn testimony of the locker room attendants.[8]   Lastly, and further cementing the facetiousness of Plaintiff's false claim here of "prejudice," *there was no security video camera within the locker room so there was no footage to preserve!*

Finally, Plaintiff engages in additional slight of hand by arguing that the sought-after security video camera footage is needed so that she can "confront" various witnesses.  To the contrary, it is undisputable that all the pertinent activity of the witnesses – the Plaintiff's, the three locker room attendants and the three WTA trainers – took place *inside* the locker room where, again, there was no security video camera in operation.  To the extent that any witness left the women's locker room, their "comings and goings" were fully captured by the security camera video footage that Defendants preserved and turned over to Plaintiff.

As to Ms. Scheumann, it must be noted that she was under no obligation whatsoever to even search for the Plaintiff before her and the rest of the WTA training staff left for the evening just before Plaintiff's accident happened.  Having done so, however, the security camera video

---

[8] Defendants provided detailed information in their Automatic Disclosures about the cleaning substance used on the physiotherapy floor in the form of its Material Data Safety Sheet.

footage that Defendants preserved and turned over to the Plaintiff shows Ms. Scheumann leaving the women's locker room at a specific time, walking toward the area of the player's lounge and players Fitness Center, returning to the entrance of the women's locker room at a specific time and then proceeding up the corridor toward the interview rooms/press area before returning to the women's locker room for the last time.  A few minutes later, Ms. Scheumann and the other two WTA trainers are seen leaving the women's locker room (with their bags) for the evening.  Thus, the reality is that Plaintiff knows exactly *when* Ms. Scheumann left the locker room to look for the Plaintiff and *when* she returned.  Plaintiff also knows from her sworn testimony *where* she went and with whom (if anyone) she spoke once she got there.  Moreover, as established by the Affidavit of Mr. Rodriguez, it is highly questionable whether any of the security video cameras at the National Tennis Center would have revealed any information regarding Ms. Scheumann's search for the Plaintiff that was not already captured by the security video camera located just outside the women's locker room.

The Court is respectfully reminded that Plaintiff's counsel deposed Ms. Scheumann over several hours in this case and had a full opportunity to "confront" her about her story; in fact, he did so quite capably in his aggressive questioning of her.  Plaintiff's counsel also had, and would have again upon request, an opportunity to inspect the National Tennis Center facility if Plaintiff is interested in "recreating" Ms. Scheumann's search for the Plaintiff.

To otherwise now suggest that Plaintiff needed security camera video footage – some of which never existed – to "confront" Ms. Scheumann and the other witnesses is, quite simply, a distortion of the record and the information obtained through discovery thus far.

23

## POINT V

## PLAINTIFF HAS NOT ESTABLISHED THAT SHE IS ENTITLED TO ANY SANCTION, INCLUDING PUNITIVE MONETARY SANCTIONS

For the reasons set forth herein, Plaintiff has failed to meet her burden of establishing that she is entitled to any sanction with respect to any item of evidence, much less the suggestion that Plaintiff is entitled to punitive monetary sanctions.   Although "the sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence," *Residential Funding Corp.*, 306 F.2d at 108, a sanction is by no means mandatory.  *See Twitty v. Salius*, 455 Fed. Appx. 97, 99 (2d Cir. 2012).[9]  Here, among other things, Defendants preserved and produced exactly the security camera video footage for which she asked.  Moreover, Plaintiff has utterly failed to meet her burden of establishing that the sought-after security camera video footage even existed or, if it existed, that it was relevant and material to her claims or the Defendants' defenses.  *See Research Found. of State Univ. of N.Y. v. Nektar Therapeutics*, 2013 U.S. Dist. LEXIS 68912 (N.D.N.Y. May 15, 2013).   Nor has she demonstrated that the Defendants acted, or failed to act, with the requisite state of culpable mind.

---

[9] In *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 2017 U.S. LEXIS 2613, 12 (U.S. Apr. 18, 2017), it was noted that the "U.S. Supreme Court noted that "[t]his Court has made clear that such a [monetary] sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature." *Citing Mine Workers v. Bagwell*, 512 U. S. 821, 826-830, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994).  "In other words, the fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Goodyear Tire*, 2017 U.S. LEXIS 2613, 12 (citations omitted). "That means, pretty much by definition, that the court can shift only those attorney's fees incurred because of the misconduct at issue." *Goodyear Tire & Rubber Co. v. Haeger*, , 2017 U.S. LEXIS 2613, 13 (U.S. Apr. 18, 2017)

## POINT VI

## PLAINTIFF HAS INTRODUCED EXTRANEOUS AND IRRELEVANT ARGUMENTS IN AN ATTEMPT TO PUT DEFENDANTS IN A BAD LIGHT AND CONFUSE THE ISSUES BEFORE THE COURT

Perhaps nowhere is Plaintiff's Motion more disingenuous than where she claims that Defendants have engaged in unfair discovery tactics.  In so doing, and again merely as a smokescreen to hide the weakness of her arguments and curry favor with the Court,  Plaintiff raised irrelevant issues pertaining to the disclosure of the locker room attendants and Defendants' insurance coverage.[10]  She also asserts unverifiable accusations that, for example, the internal investigation conducted by the USTA in-house counsel shortly after the accident was a "sham cover-up" and "unfathomable" and was evidence that "the USTA was already in litigation mode."[11] *See Plaintiff's Motion,* pp. 3, 18*.*  She also accuses Defendants of somehow making a "scapegoat" of one of the locker room attendants (*See Plaintiff's Motion,* p. 18) -- all of this, one must speculate, for salacious public consumption through the media.

### A.  Disclosure and Testimony of Locker Room Attendants

Although Plaintiff's Motion, in theory and in fact, pertains solely to the Defendants' alleged failure to preserve security camera video footage, Plaintiff for some reason spends considerable effort accusing the Defendants of failing to disclose which of the three locker room attendants actually applied the cleaner to the floor of the physiotherapy room on the evening of

---

[10] Plaintiff has also outlined "facts" in her motion that are, in reality, *disputed* facts.  For example, Plaintiff stated that no caution sign was in place after the floor was mopped; however, Ms. Owens testified to the contrary.  *See Plaintiff's Motion*, p. 8; *see Excerpts from Deposition Transcript of Karen Owens,* annexed as Exhibit "3", pp. 61-62.

[11] Plaintiff herself wasted no time "lawyering up".  According to her own  sworn testimony, within one week of her accident, Plaintiff consulted with an attorney referred to her by her agent and went to see a doctor arranged for, and accompanied by, her attorney.  *See Excerpts from Deposition Transcript of Plaintiff,* pp. 120-123, annexed as Exhibit "2".

the accident. How this allegation, or Plaintiff's claim that she has been deprived of delving into the cleaning process on a "step by step, minute by minute" basis, pertains to Plaintiff's spoliation claim is anyone's guess, but it is also a complete smokescreen behind which there is no fire.

The *facts* are as follows:

1.   In their Rule 26 Initial Disclosures, Defendants identified the three locker room attendants working in the women's locker room on the night of the accident and provided their *names, telephone numbers and last known addresses*. *See Exhibit F to Plaintiff's Motion*, Doc. 26-6, p. 2.

2.   Defendants successfully reached one of the attendants, Karen Owens, and scheduled her deposition on a date, time and location arranged in conjunction with Plaintiff's counsel.  Ms. Owens testified under oath that the floor cleaner was applied by another attendant, Christina Simmons.

3.   Another attendant, Sandra Benavides, was contacted by the Defendants and her deposition was also arranged on a date, time and location coordinated with Plaintiff's counsel.  Ms. Benavides testified that she had no recollection as to who applied the floor cleaner on the evening of the accident.

4.   Defendants attempted to make telephone contact with Christina Simmons, but she proved to be uncooperative and rebuffed Defendants' attempts to schedule her deposition.    Accordingly, in a spirit of cooperation, Defendants provided Ms. Simmons' last known address to Plaintiff's counsel at his request, so that Plaintiff could attempt to locate her and, through a retained process server, subpoena her. When Plaintiff succeeded in serving Ms. Simmons, her deposition was scheduled.

26

She testified that Ms. Owens had applied the floor cleaner on the evening of Plaintiff's accident.

What we have here is not "scapegoating" or a "cover-up". *What we have is a classic "issue of fact"* between two witnesses who testified about events that occurred 1-2 years earlier – something that the jury will have to resolve at trial, just like all juries are asked to do.

Of course, it bears repeating that the jury at the trial of this case is not even likely to waste its time on the issue of, "*Which attendant applied the floor cleaner*?" – simply because, as mentioned before in the Memorandum, *the Defendants have never denied that a cleaner was applied to the physiotherapy floor on the evening of the Plaintiff's accident.* What difference does it make which attendant applied it?

Why the Plaintiff would have the Court waste its time on this issue can only be explained by Plaintiff's insatiable desire, perhaps, to play to the media and invent a controversy where none exists.


## B. <u>Insurance Information</u>

In their Initial Disclosures, Defendants' counsel provided Declaration Pages pertaining to, what they had been incorrectly told by Defendants' insurer, was the insurance policy providing coverage for the Plaintiff's accident.  At no time during the weeks and months thereafter did Plaintiff inquire further of Defendants' counsel about the insurance coverage issue.

When the issue of insurance coverage was brought up during the March 2017 mediation in this case, it was realized at that time – openly, and in front of the mediator and Plaintiff's counsel – that the insurance coverage information appearing in Defendants' Initial Disclosure was incomplete and that, in fact, additional policies of insurance existed.  Defendants within

27

days began the process of correcting the disclosure in order to identify all applicable insurance policies.

At no time did the incomplete insurance information made by Defendants prevent Plaintiff form prosecuting her claim and actively partake in litigation.  Certainly, and without question, the information in Defendants' Initial Disclosure regarding its insurance coverage did not prevent Plaintiff from taking a very aggressive stance during efforts to resolve this litigation. In summary, she was not harmed at all by Defendants first insurance disclosure.


C.  **Playing "Fast and Loose" with Discovery**

In her Motion, Plaintiff has raised accusations pertaining to the internal investigation by Defendants' in-house counsel[12] and has even suggested that, somehow, Defendants' post-accident internal investigation of Plaintiff's accident is evidence of Defendants' culpable conduct or a culpable state of mind. *See Plaintiff's Motion,* pp. 18-21.

First of all, it is interesting that Plaintiff's counsel, as skilled and experienced as he is, would find it questionable, improper, or (in his own words) "unfathomable" that, after the accident, an organization as large and prominent as the USTA would have the temerity to investigate the accident through the fact-gathering conducted by its in-house counsel.  This is such common practice that not much more needs to be said about it. Suffice to say that the USTA/NYC's  post-accident in-house investigation showed, if nothing else, that Defendants took all necessary and appropriate steps to determine what security camera video footage was related to Plaintiff's accident and, indeed, preserve it for later delivery to the Plaintff.

---

[12] It must be noted that in her motion Plaintiff, without any foundation, claim that Defendants' in-house counsel failed to issue a litigation hold.  Although Defendants' in-house counsel's actions are protected by the attorney-client and/or work product doctrines, Defendants' in-house counsel did, in fact, properly issue a litigation hold. Plaintiff's accusation is therefore baseless and was made without any foundation simply to discredit Defendants in the eyes of the Court.

6528950v.3

Undoubtedly, the USTA's in-house counsel knew, as Plaintiff notes in her Memorandum, that the fruits of her investigation "would be protected from disclosure in any impending litigation" by various privileges recognized in the common law for centuries.  Taken to its logical conclusion, Plaintiff's argument would make it seem that companies have no right to conduct their own investigations of accidents occurring on their premises and to have those investigations protected.  If that practice is a problem, then American judicial system should not hesitate to blow up the attorney work-product and attorney-client privileges.[13]

## CONCLUSION

Defendants took all reasonable steps to preserve and produce all security camera video footage required under the common law and, more importantly, exactly that security video that Plaintiff had requested through her counsel's request letter of September 16, 2015.  Plaintiff's motion fails to establish that the remaining sought-after security video either existed or, if it existed and was preserved, would have been relevant, material and otherwise probative of any issue before this Court.  She likewise has failed to establish prejudice or that Defendants acted with the requisite culpable state of mind that warrants a sanction.  Instead, she engages in speculation, imagines a procedural history that never occurred and mischaracterizes the Defendant's intentions.  Respectfully, Defendants respectfully request that the Court deny Plaintiff's motion in all respects.

---

[13] In that case, Defendants would be able to argue that Plaintiff's post-accident investigation of her accident should not be immune from disclosure.

TO:   Benedict P. Morelli, Esq. (BM6597) (Via ECF)
       David T. Sirotkin, Esq. (DS4863)
       Perry S. Fallick (PF1165)
       Attorneys for Plaintiff
       Eugenie Bouchard
       Morelli Law Firm, PLLC
       777 Third Avenue, 31st Floor
       New York, New York 10017
       Tel: (212) 751-9800
       Fax: (212) 751-0046

30